Janice BRUHN, Plaintiff,

v.

Emmett FOLEY, Individually and in His Official Capacity as Weed Board Member for Box Butte County; Larry Schefcik, Individually and in His Official Capacity as Weed Board Member for Box Butte County; Box Butte County Weed Board; and Box Butte County, State of Nebraska, Defendants.

No. 7:CV92–5007.

United States District Court, D. Nebraska.

April 20, 1993.

Memorandum and Order on Attorneys Fees June 3, 1993.

1346

Frankie J. Moore, McCarthy, Gale Law Firm, North Platte, NE, Lori A. Zeilinger, Zeilinger Law Office, Grant, NE, for plaintiff.

James R. Hancock, Hancock, Denton Law Firm, Scottsbluff, NE, for defendants.

## MEMORANDUM OF DECISION

PIESTER, United States Magistrate Judge.

 Plaintiff filed this action alleging defendants failed to hire her on account of her gender in violation of: (1) the Civil Rights Act of 1964 (Title VII); (2) 42 U.S.C. § 1983; and (3) the Nebraska Fair Employment Practice Act. *See Neb.Rev.Stat.* §§ 48–1101 *et seq.* (Reissue 1988).[1] Trial was held in North Platte, Nebraska commencing on January 26, 1993 and continuing for 3 days.[2]

---

1. Plaintiff's claim under the Nebraska Fair Employment Practice Act (NFEPA) is asserted pursuant to this court's supplemental jurisdiction. *See* 28 U.S.C. § 1367. There are two potential problems with this claim. First, it appears plaintiff has abandoned this claim, having failed to argue it at trial, mention it at pretrial, or request relief under the NFEPA in her complaint. Second, and more importantly, there is some question as to whether, under the circumstances, this court has jurisdiction to entertain this state law claim.

The NFEPA does not expressly provide for a private judicial right of action for those individuals claiming to be aggrieved by an employer's unlawful employment practices under the Act. *See Miller v. Union Pacific R. Co.,* 539 F.Supp. 134, 137 (D.Neb.1982) (declining to exercise pendent jurisdiction over plaintiff's NFEPA claim because it is unclear whether the Act provides a private right of action). Rather, the NFEPA provides a comprehensive administrative remedy to persons claiming a violation of the Act, consisting of an administrative hearing and appeal of the administrative ruling to state district court for *de novo* review. *See Neb.Rev.Stat.* § 48–1116 to 48–1120. The only instance where it appears an individual may claim a private right of action under the NFEPA is where the alleged violation of the NFEPA is asserted not as the sole cause of action, but as the basis for a claim under *Neb. Rev.Stat.* § 20–148 (Reissue 1987), which creates a civil cause of action for the violation of rights secured by the constitution and laws of the State of Nebraska. *See, e.g., Biberos v. Dayco Products, Inc.,* CV90–L–23 (D.Neb. Dec. 17, 1990) (available on WESTLAW, 1990 WL 302888). In this case plaintiff has not pleaded a violation of § 20–148, but only a violation of the NFEPA. It therefore is unclear whether she may maintain a private cause of action for the alleged violation of the NFEPA.

I need not resolve the issues of whether plaintiff may maintain a private cause of action for violations of the NFEPA, because, even if she could (and assuming she had not abandoned such claim), she would be entitled to no different relief under the NFEPA than that to which she is entitled under Title VII. *See* § 48–1119 (setting forth available equitable relief). As such, any claims which could be asserted under the NFEPA will be adequately addressed by this court's disposition of plaintiff's Title VII claim.

2. The parties consented to have this action proceed before me pursuant to 28 U.S.C. § 636(c). (Filing 34).

At the close of plaintiff's case defendants made a motion for directed verdict which was taken under advisement. For reasons stated more fully below, I shall deny the motion for directed verdict and enter judgment for plaintiff.[3]

## I. *Findings of Fact*

Plaintiff was first employed by the Box Butte County Weed District Board (weed board) in the spring of 1986, as a part-time sprayer during the summer months.[4] She continued to work as a sprayer for the weed board over the next few years, during which time she also began taking on more responsibility and assisting the weed superintendent, Chris Burks, in nearly every facet of the weed board's business.[5]

In March of 1987, defendant Foley, a member of the weed board, headed an attempt to force Chris Burks to resign as weed superintendent, after he and others on the weed board become dissatisfied with her performance. At some point during the attempt to force the resignation of superintendent Burks, Gary Craig was first approached by defendant Foley about the prospect of applying for the superintendent position. The possibility of an opening for superintendent was discussed, and defendant Foley suggested to Gary Craig that he obtain his EPA certification so that he would meet the statutory qualifications for the position of superintendent when it became available.[6]

As a result of the attempt to force Chris Burks' resignation, the weed board discovered they lacked the statutory authority to hire and fire weed superintendents, and that such decisions were to be made by the Box Butte County Board of Commissioners (county board).[7] The county board chose to retain superintendent Burks, who had received awards for her performance as weed superintendent.[8] The evidence showed that following this failed attempt to force her resignation, the relationship between Chris Burks and the weed board was strained.

On November 7, 1989, at a regularly scheduled meeting of the county board, superintendent Burks resigned her position in order to accept employment with the Nebraska Department of Agriculture. At that meeting the county board appointed plaintiff as acting superintendent, effective immediately, pending the hiring of a permanent weed superintendent. Plaintiff's salary was set at $1,200.00 per month with no benefits. A public announcement was made regarding the permanent superintendent position, and an interview date was set.

At this time members of the weed board once again approached Gary Craig about applying for the superintendent position. De-

---

3. Also pending at the time of trial was a motion to dismiss filed by defendants Foley and Schefcik. (Filing 22). A review of the file, however, indicates the motion was untimely filed under the Federal Rules of Civil Procedure. Motions to dismiss pursuant to Rule 12(b)(6) are to be filed prior to the filing of an answer. *Fed.R.Civ.P.* 12(b). In this instance, defendants' motion to dismiss was filed roughly 2½ months after their answers were filed. Therefore, defendants' motion to dismiss is improper under the rules, and will be denied.

4. Pursuant to the Noxious Weed Control Act, *Neb.Rev.Stat.* § 2–945.01 *et seq.* (Reissue 1991), each county has a Weed District Board to carry out the provisions of the Act.

5. Specifically, plaintiff assisted the superintendent by repairing, assembling and disassembling spraying equipment, helping with weed board paperwork and documentation, helping administer existing weed board programs, helping implement new programs, training new employees, running the office when the supervisor was out

of town, and helping to set up and operate a booth at the county fair to educate the public about the weed board.

6. *Neb.Rev.Stat.* § 2–954(3)(a) requires that, as a condition precedent to employment, the superintendent must be certified by the Environmental Protection Agency as a commercial applicator under the Federal Insecticide, Fungicide, and Rodenticide Act.

7. In the past, the weed board had hired approximately 7 weed superintendents with no involvement from the county board. It was not until March of 1987 that the weed board learned they lacked authority to hire or fire the weed superintendent. *See Neb.Rev.Stat.* § 2–954(3)(a) ("Each county board shall employ one or more weed control superintendents.")

8. Chris Burks received an award for "Rookie of the Year" in 1987, and an award for "Outstanding Superintendent" in 1989 from the Nebraska Association of Weed Superintendents.

fendant Foley personally spoke to Gary Craig and asked whether he had obtained his EPA certification as they had discussed earlier. During the conversation defendant Foley informed Gary Craig what was needed to qualify for the superintendent position; Foley testified he did not have a similar conversation with plaintiff, although he knew she had been appointed acting superintendent and suspected she would apply for permanent position. Gilbert Schance, another member of the weed board, also testified that he approached Gary Craig at this time about applying for the superintendent position and suggested Craig obtain his EPA certification. Following these discussions Gary Craig submitted his application for the position of weed superintendent.

At a meeting on November 21, 1989 the weed board and county board became aware that the only two applicants for the superintendent's position were plaintiff and Gary Craig. Kenneth Luce, a member of the weed board, testified that after discussing the applicants, three members of the weed board stood up and announced they wished to hire Gary Craig as the new superintendent.[9] When Kenneth Luce reminded the three that interviews had not yet been held, they sat down and the meeting continued.

Interviews were held on December 19, 1989. Present during the interviews were all five members of the weed board[10] and all three members of the county board.[11] Gary Craig was interviewed first, because plaintiff was finishing weed board business in another office in the courthouse when the interviewers were ready to begin. Gary Craig testified that just prior to his interview he was provided with a written job description and a

list of questions he may be asked during the interview.[12] He was given an opportunity to review the job description and questions prior to the interview, and returned them to the interviewers after his interview.

Plaintiff was then interviewed. Unlike Gary Craig, she was not provided with a written job description and list of questions prior to or at any point during her interview. When asked about the number of categories on her EPA card, plaintiff informed the interviewers that she had recently been certified in two more categories, bringing her total EPA categories to five.[13] This evidently angered certain weed board members, who refused to consider plaintiff's recently-added categories and instead insisted on comparing the applicants on the basis of their EPA categories as they existed on the date the applications were submitted—when plaintiff had three categories and Gary Craig had four.

Following the interview, the weed board voted 3–2 to hire Gary Craig as weed superintendent. When it was pointed out that such a vote was improper—not having taken place at an official weed board meeting—it was agreed to postpone the taking of a vote until the next weed board meeting.

After the December 19th interviews, Kenneth Luce, a member of the weed board, contacted the Equal Employment Opportunity Commission (EEOC) because he was concerned about the possibility that the board's actions were discriminatory. Following his contact with the EEOC, Luce drafted a letter (exhibit 9), which he distributed to every member of the weed board and every county commissioner. The letter discussed Luce's

---

**9.** According to Kenneth Luce, defendants Foley, Schefcik and weed board member Gilbert Schance were the three who spoke up at the meeting in favor of hiring Gary Craig. Adding credibility to this testimony is the testimony of defendant Foley, who testified he had decided to hire Gary Craig prior to interviewing either applicant because he felt Gary Craig was "the man that had the brains for the job." Foley stated he was not bothered by Gary Craig's lack of experience or lack of knowledge regarding noxious weed control.

**10.** Emmett Foley, Larry Schefcik, Gilbert Schance, Kenneth Luce and Larry Lehl.

**11.** Leslie Stull, Donald Hansen and Clifford Bartels.

**12.** He testified that some of the questions asked of him were on the list; others were not.

**13.** In October of 1989, prior to her appointment as acting superintendent, plaintiff began the process of adding two more categories to her EPA card. She completed the requisite tests before submitting her application, and prior to the December 19th interview she received documentation that she had passed the tests and obtained two additional EPA ratings.

concern that plaintiff was being discriminated against on the basis of her gender with respect to the weed superintendent position, and asked the county board to disregard the recommendation of the weed board due to the irregular manner in which they had conducted the December 19th meeting.

On January 4, 1990, the weed board met to vote on the hiring of a superintendent. . The county board requested the vote and was present at the weed board meeting. At the meeting the weed board voted 3–2 to hire Gary Craig.[14] Kenneth Luce suggested that weed board members comment on their reasons for voting as they did, and their responses were recorded in the minutes. (*See* Exhibit 8). Defendant Foley voted for Gary Craig because "[h]e by far had the superior resume." Defendant Schefcik voted for Gary Craig because "[h]e had the best resume, he's the best qualified." Gilbert Schance voted for Gary Craig because he felt "[h]e has the best qualifications, at the time ·of his application, he had the best card. He managed two fertilizer plants and had people under him. He operated a Big A." Larry Lehl voted for plaintiff because "[s]he worked here for four years prior to applying for the superintendent's job and she has the best qualifications for the job." Kenneth Luce voted for plaintiff because "[s]he has a college education, she has four years experience in this job and she is best qualified."

On January 9, 1990, the county board met and, following presentation of the weed board's 3–2 vote in favor of Gary Craig, the county board voted to hire Gary Craig as weed superintendent effective February 1, 1990.[15] Shortly after being hired as weed superintendent, Gary Craig was also hired as Box Butte County Road Superintendent. He presently serves in both ·capacities.

Once Gary Craig became weed superintendent, plaintiff sought other employment. After collecting unemployment compensation for a brief period, she secured a job as a crop adjuster with American Agribusiness. To supplement her income, she· also returned to teaching part-time. In March of 1992 plaintiff and Chris Burks, the former weed superintendent, decided to start their own weed control business. The business, called JC Vegetation Control, services Box Butte County and a number of surrounding counties as well as areas in South Dakota. Because the new business required plaintiff's full attention, she quit her other jobs and now works full-time for JC Vegetation Control.

As a result of defendants' actions in rejecting her for the position of weed superintendent, plaintiff testified that she suffered both emotionally and physically. She became depressed, was unable to sleep, became emotional and cried when she saw people on the street, and felt as though her reputation in the community had been destroyed. She gained 40 pounds following the incident, and although she sought medical attention, she was able to afford ·only one visit.

## II. *Conclusions of Law*

### A. Title VII Claim

 Plaintiff's Title VII claim was brought against Box Butte County and the Box Butte County Weed Board.[16] In

---

14. Voting in favor of Gary Craig were defendants Foley, Schefcik and weed board member Gilbert Schance. Voting in favor of plaintiff were weed board members Kenneth Luce and Larry Lehl.

15. According to a news reporter who was present at the January 9, 1990 county board meeting, the board announced that the hiring decision had been essentially left to the weed board because they were the individuals who had to deal directly with the weed superintendent. Lending further support to the conclusion that the county board's vote was a "rubber stamp" of the weed board's earlier decision and subsequent recommendation is the testimony of Larry Lehl, who was informed by a county commissioner that the board would follow the recommendation of the

weed board regarding the hiring of a new superintendent.

16. Although plaintiff named the Box Butte County Weed Board as a defendant in this action, she has presented no evidence that this defendant is a suable entity under Nebraska law. I acknowledge that the complaint alleges the weed board is a political subdivision of the State of Nebraska (filing 1 at 2), and further acknowledge that the parties stipulated to such in the pretrial order in this matter (filing 30 at 2). However, plaintiff's contention, and defendants' apparent agreement, that the weed board is a political subdivision does not serve to make it so under the law. No evidence was submitted regarding the status of the weed board as a political subdivision, and a

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the United States Supreme Court established a three-step framework for analyzing employment discrimination cases such as the one asserted by plaintiff. Recently, the Eighth Circuit Court of Appeals described the McDonnell Douglas–Burdine test as follows:

> Under the first stage of the McDonnell Douglas–Burdine framework, the plaintiff has the burden of production to establish a prima facie case of discrimination. A plaintiff must generally demonstrate four elements to establish a prima facie case: (1) that plaintiff is a member of a protected class, (2) that the plaintiff meets the minimum qualifications for the position, (3) that the plaintiff suffered some kind of adverse employment action, and (4) that the employer continued to try to fill the position from among applicants with plaintiff's qualifications.

> \* \* \* \* \* \*

> A plaintiff who establishes a prima facie case "in effect creates a presumption that the employer unlawfully discriminated against the employee," ... and the analysis reaches the second stage of the McDonnell Douglas–Burdine framework. In the second stage, the burden of production "shifts to the defendant 'to articulate some legitimate nondiscriminatory reason for the employee's rejection.' "

> \* \* \* \* \* \*

> A defendant who articulates a legitimate, nondiscriminatory reason overcomes the presumption of discrimination raised by the prima facie case ... and the case must them proceed to the third stage of analysis. At the third stage, the plaintiff must demonstrate that the defendant's proffered reason is mere pretext, "either directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence."

*Hase v. Missouri Division of Employment Security*, 972 F.2d 893, 896 (8th Cir.1992) (citations omitted).

■ In this instance I conclude plaintiff has established a prima facie case of sex discrimination by demonstrating that: (1) she is a member of a protected class under Title VII; (2) she was qualified for the position of weed superintendent;[17] (3) she was denied the position of weed superintendent, and; (4) defendants hired a male to fill the position. Thus, plaintiff has, in effect, created a presumption that she was unlawfully discriminated against and the burden of production now "shifts to the defendant 'to articulate some legitimate nondiscriminatory reason for the employee's rejection.' " *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824).

■ Defendants articulate a number of reasons why they chose Gary Craig over

---

review of the statutes does not indicate the weed board was created as a political subdivision or that the weed board is an entity capable of suing or being sued. Accordingly, I am unable to conclude that the weed board is a proper defendant in this action and all claims asserted against the Box Butte County Weed Board must fail.

Of course, the actions of the weed board remain relevant to this claim because the county relied heavily upon the recommendation of the weed board in making the final hiring decision, and the weed board played an integral role in both the interview process and other events leading up to the decision to hire Gary Craig over plaintiff. I therefore conclude the weed board acted as an agent of the employer (Box Butte County) within the meaning of § 2000e(b). *See Jiles v. Ingram*, 944 F.2d 409, 413 (8th Cir.1991) (affirming Title VII relief against the city because the city's agents intentionally discriminated against plaintiff on basis of his race).

17. I note that, for purposes of establishing a prima facie claim, plaintiff need only present evidence demonstrating her objective qualification for the position of weed superintendent. *See Legrand v. Trustees of Univ. of Ark., Pine Bluff*, 821 F.2d 478, 481 & n. 4 (8th Cir.1987) (objective evidence that plaintiff satisfied the normal requirements for the job is all that is required at the prima facie stage). In this instance, the evidence showed, and defendants have admitted, that plaintiff was qualified for the position of weed superintendent. *See, e.g.*, plaintiff's exhibit 26 (defendants' answers to request for admissions).

plaintiff for the position of weed superintendent. Based upon the evidence adduced at trial, I find the proffered reasons to be pretextual.

First, defendants suggest Gary Craig was hired because he had the better resume. The evidence did not bear this out. A brief comparison of the resume and cover letters submitted by plaintiff and Gary Craig (exhibits 26 and 4) demonstrates the frailty of defendants' assertion.

Plaintiff's resume indicated she had been employed for the past four years with the weed control board, during which time she had an active part in the development and implementation of many programs. She conducted weed board business in the superintendent's absence, became familiar with the Weed Control Act and learned the mapping and record-keeping procedures used by the weed board. Her resume further indicated that while working for the weed board she developed a working relationship with most of the Box Butte County landowners and had designed individualized programs to meet their weed control needs. She supervised and trained new weed board employees, supervised the mixing and applying of herbicides, and educated the public regarding weed control practices. She had a working knowledge of weed inspection and enforcement procedures and had experience running the prairie dog control program in the off-season. She operated and maintained the vehicles and spray equipment used by the weed board, including installing and repairing small engines and electric pumps used in spraying.

In contrast, Gary Craig's resume indicated he had been employed by Box Butte County as a road grader for the past six years. Prior to that, he had been a self-employed farmer for seven years. He had no experience working for the weed board, no experience carrying out a weed eradication program, no experience administering a prairie dog program, no experience mapping weed infestations or documenting the spraying of weeds, and no experience maintaining the equipment used in the weed control program.[18] His resume indicated he worked with chemical fertilizers a number of years prior to applying for weed superintendent,[19] but he admitted in his cover letter that he was not familiar with newer chemicals.[20] After comparing the two resumes in light of the specific duties of the superintendent set forth in *Neb.Rev.Stat.* § 2–954(3)(b)[21], it is evident that defendants' assertion that Gary Craig was hired because he had the better resume is not worthy of credence.

Next, defendants assert they hired Gary Craig over plaintiff because he had mechanical ability. Defendants acknowledged that mechanical ability was not identified specifically as a hiring criterion, but maintained it was nonetheless something they were looking for in a weed superintendent. There was no evidence that mechanical ability had ever before been a consideration when choosing a

18. Donald Hansen, one of the two Box Butte County Commissioners who voted to hire Gary Craig, testified that although Gary Craig did not have any experience carrying out a weed control program or mapping weeds, he assumed Gary Craig thought about such things as he drove around on the road grader because he was "that kind of guy."

19. Gary Craig's resume indicates that for six months in 1983 he worked for the Alliance CO–OP in the fertilizer department; from 1971 to 1973 he managed the fertilizer department for the Keith County CO–OP; and from 1967 to 1969 he was a manager for the Brown Chemical Company where he sold and supervised the application of chemicals.

20. Additionally, I note there was evidence presented that Gary Craig's resume contained misrepresentations. For instance, although his resume represents that he graduated from Alliance High School in 1960, he testified that he did not actually complete high school, but did later receive his G.E.D. while in the Army. Additionally, his resume indicated he managed the Keith County CO–OP, but when a member of the weed board checked his references, he was informed that Gary Craig had worked not as a manager, but as an operator for the Keith County CO–OP.

21. That statute provides that it is the duty of the superintendent to: (1) examine all lands to determine compliance with the Weed Control Act; (2) compile data on infested areas; (3) advise upon matters pertaining to the most practical methods of weed control; and (4) investigate violations of the Weed Control Act. Plaintiff's resume indicated she had experience carrying out these statutory duties; Gary Craig's indicated he had no such experience.

weed superintendent, and no evidence that any past weed superintendent had mechanical ability. Mechanical ability is not mentioned among the requirements listed in the statute. *See Neb.Rev.Stat.* § 2–954(3)(a) and (b). Nevertheless, there was abundant evidence presented at trial that plaintiff had such ability. For instance, plaintiff testified that while working for the weed board she fixed vehicles' radiators, installed a fuel pump, installed power steering, installed a new starter, repaired the rear end of a vehicle, removed small engines, fixed broken sprayers, built spray equipment and altered vehicles to accommodate spray equipment. Defendants testified that although they had no personal knowledge regarding her mechanical aptitude, they did not believe she had the mechanical skills she professed in her resume and at the interview.[22]

The fact that one need not have mechanical ability to be qualified for the position of weed superintendent, coupled with the fact that mechanical ability did not appear to have been a concern in the past, suggests this reason for plaintiff's rejection is a pretext for gender discrimination. Lending further support to this conclusion is the fact that plaintiff *had* mechanical ability which defendants chose either to ignore or deny.

Defendants next assert they hired Gary Craig over plaintiff because he had been a farmer and thus had an "instinctive" love of the land and knowledge of weeds.[23] Despite the claimed importance placed upon a farming background, defendants did not ask plaintiff during her interview whether she had a farming background.[24] Ironically, had defendants asked, they would have discover-

ed plaintiff grew up working on a ranch, worked periodically as a ranch hand once she left home, and, while teaching school, picked up extra hours on weekends and during summers working as a hired hand on a dairy farm. Although defendants suggest that a farming background makes one qualified for the position of weed superintendent, farming does not appear in the statute as a necessary qualification, plaintiff was not asked during the interview about her farming background, and there was no evidence that former weed superintendents had been farmers or that farming had ever before been a consideration when hiring a weed superintendent. The evidence indicates this proffered reason for hiring Gary Craig over plaintiff is a pretext for gender discrimination.

Defendants also testified that they hired Gary Craig over plaintiff because Craig had more categories on his EPA card. Contrary to defendants' contention, the evidence indicates that at the time of the interview plaintiff had five categories on her EPA card and Craig had only four. Defendants' position that Gary Craig had the better EPA card is based upon their decision to ignore the two categories plaintiff added prior to the interview, choosing instead to compare plaintiff and Gary Craig on the basis of their EPA categories as they existed on the date the applications were submitted. The conscious decision to ignore two of plaintiff's valid EPA certification categories strongly suggests that her qualifications were intentionally overlooked for reasons unrelated to obtaining the most qualified applicant at the time of hiring.[25]

---

**22.** For instance, defendant Foley testified that although he knew nothing of plaintiff's mechanical experience, he did not believe a former school teacher could work on machinery. Defendant Foley's statements to the Nebraska Equal Opportunity Commission investigator were reported as follows:

Foley stated that he did not feel that the Complainant could work on machinery because she had previously been a school teacher. Foley stated that, "She could put gas into an engine and change oil but when it came to taking a wheel off a vehicle or changing the brakes I do not believe she could do it, even if she told me she could." Foley stated that, "Since her mentor, Chris Burks (previous superintendent) couldn't work on machinery I figured that she

couldn't either ... when it took a little bit of brain and brawn she wasn't able to do it." (Exhibit 1 at 5).

**23.** There was also testimony that although having a farming background was not required, it helped because farmers have a special sense that weeds need to be taken care of. Gary Craig stopped farming in 1983, 6 years before he applied for the position as weed superintendent.

**24.** Nor did plaintiff include this information on her resume.

**25.** Under the defendants' reasoning, a tennis professional could be found "less qualified" today than an amateur athlete who had defeated her

Additionally, defendants state in their answers to interrogatories (exhibit 26) that Gary Craig was hired over plaintiff because the weed board felt plaintiff "would also be in the same category of ineptitude" as her female predecessor, with whom certain members of the weed board had not gotten along. While the ability to get along with the board is a legitimate hiring concern, there was no evidence presented that plaintiff did not get along with members of the board. Rather, the evidence indicated that plaintiff's female predecessor did not get along with members of the weed board, and, based upon the strained relationship with the former female superintendent, defendants assumed plaintiff, also a female, would likewise be "inept" and difficult to get along with. Thus, it appears defendants' concern that plaintiff would be difficult to get along with was based not upon any past experience with plaintiff, but upon her status as a female.

Based upon the evidence, I am persuaded that a discriminatory reason—plaintiff's gender—motivated the county board of commissioners to hire Gary Craig over plaintiff, and that defendants' proffered explanations for hiring Gary Craig and rejecting plaintiff are unworthy of credence. I therefore conclude defendant Box Butte County is liable to plaintiff for intentionally violating her rights under Title VII.

**B. 42 U.S.C. § 1983 Claim**

█ Plaintiff's § 1983 claim was brought against defendants Foley, Schefcik and Box Butte County. Plaintiff claims these defendants rejected her for the position of weed superintendent on the basis of her gender and thereby violated her rights under the Equal Protection Clause of the Fourteenth Amendment.

█ The Equal Protection Clause is essentially a command that the government

treat similarly situated persons in a like fashion. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 438, 105 S.Ct. 3249, 3253, 87 L.Ed.2d 313 (1985).[26] This command, however, is not absolute. *G.D. Searle & Co. v. Cohn*, 455 U.S. 404, 409, 102 S.Ct. 1137, 1142, 71 L.Ed.2d 250 (1982). Disparate treatment on the basis of gender will only offend the Equal Protection Clause if the discrimination does not "serve important governmental objectives" and is not "substantially related to the achievement of those objectives." *Orr v. Orr*, 440 U.S. 268, 279, 99 S.Ct. 1102, 1111, 59 L.Ed.2d 306 (1979); *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976).

Having previously concluded that the recommendation and decision to hire Gary Craig instead of plaintiff was improperly based upon plaintiff's gender, *see* Title VII discussion *supra*, plaintiff is entitled to relief on her equal protection claim if defendants do not carry their burden of showing a substantial relationship between this gender-based discrimination and an important governmental objective. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982) (party seeking to uphold discriminatory classification must carry burden of showing the classification substantially serves an important governmental interest); *Rostker v. Goldberg*, 453 U.S. 57, 88, 101 S.Ct. 2646, 2663, 69 L.Ed.2d 478 (1981) (party defending the challenged classification carries the burden of demonstrating both the importance of the governmental objective served by the classification and the substantial relationship between the discriminatory means and the asserted end). Defendants presented no evidence indicating that discriminating on the basis of gender in the hiring of the weed superintendent served any important governmental objective. I conclude, therefore, that plaintiff is entitled to relief on her equal protection claim.[27]

years before, even if the amateur had never played the game again. A coach using such reasoning would not last long.

**26.** In this instance, I conclude plaintiff and Gary Craig were similarly situated. Both were applicants for the position of weed superintendent and the evidence showed both met the minimum statutory qualifications for the position.

**27.** Additionally, I note the Eighth Circuit has held that when a plaintiff asserts both a Title VII claim and a § 1983 claim based on a violation of equal protection, the analysis is essentially the same under both claims and a plaintiff who prevails on the Title VII claim is likewise entitled to relief under § 1983. *Hicks v. St. Mary's Honor Center*, 970 F.2d 487, 490–91 (8th Cir.1992)

■ Because defendants Foley and Schefcik were acting under color of law, were personally involved in the gender-based discrimination that underlies plaintiff's equal protection claim, and because their actions were causally connected to the decision not to hire her, they too are liable to plaintiff under § 1983 for discriminating against her upon the basis of her gender in violation of the Equal Protection Clause. *See Hicks,* 970 F.2d at 491 (defendant who recommended plaintiff's termination was liable under § 1983 because his acts were causally connected to plaintiff's discriminatory termination).

■ In *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court made clear that a local government entity can be held liable under § 1983 for acts it has officially sanctioned or ordered. *Id.* at 479–80, 106 S.Ct. at 1298. Even a single decision by a governing body with responsibility for establishing final policy will constitute an official government policy upon which liability can be premised. *Id.* at 480, 106 S.Ct. at 1298. Because the actions of the Box Butte County Commissioners can provide a basis for county liability, *see Pembaur v. Cincinnati,* 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12 (noting decisions of county commissioners provide a basis for county liability), I conclude Box Butte County is liable to plaintiff under § 1983 for discriminating against her upon the basis of her gender in violation of the Equal Protection Clause.

### III. *Damages*

Plaintiff requests declaratory, injunctive and monetary relief. Specifically, she requests: (1) she be employed as weed super-

(elements of § 1983 equal protection claim are essentially the same as those which must be proved under Title VII), *cert. granted,* —— U.S. ——, 113 S.Ct. 954, 122 L.Ed.2d 111 (1993); *Craik v. Minnesota State University Bd.,* 731 F.2d 465, 468 n. 5 (8th Cir.1984) (in gender discrimination claim, issue of discriminatory intent is the same under the Fourteenth Amendment, § 1983 and Title VII).

28. Although Gary Craig was also employed as the Box Butte County Road Superintendent during this period, I have not considered the salary

intendent of Box Butte County with back pay and benefits; (2) she be awarded "liquidated" damages for defendant's willful violation of Title VII; (3) she be awarded compensatory and punitive damages for violation of her constitutional rights; and (4) she be awarded costs and attorneys' fees.

### A. Equitable Relief under Title VII

#### 1. *Employment*

■ Plaintiff has requested she be employed as weed superintendent of Box Butte County and be awarded back pay and benefits. Pursuant to 42 U.S.C. § 2000e–5(g), I conclude plaintiff is entitled to such relief and I shall grant defendant Box Butte County a period of 60 days following the entry of judgment in which to employ plaintiff in the position of weed superintendent for Box Butte County. I shall further order that plaintiff be awarded front pay in an amount equal to the salary provided the weed superintendent until such time as she is employed as weed superintendent.

#### 2. *Back Pay and Benefits*

Evidence showed that during 1990, 1991 and 1992 the weed superintendent was paid a total of $53,525.00.[28] During this same period, the evidence showed plaintiff earned a total of $22,837.00. Therefore, under § 2000e–5(g) (interim earnings serve to reduce the back pay otherwise allowable), plaintiff is entitled to recover $30,688.00 in back pay from Box Butte County.

Evidence also showed that during 1990, 1991 and 1992 the weed superintendent was entitled to receive [29] $802.00 in retirement

he received as road superintendent when considering the issue of back pay.

29. The evidence showed that Gary Craig did not actually receive the full amount of salary and benefits to which he was entitled because he was forced to take time off work as a result of an injury, during which time he did not receive his full salary or benefits. I have calculated the backpay and benefits to reflect what Gary Craig would have made had he not been required to take time off for the injury.

benefits,[30] $4359.39 in health insurance benefits,[31] and $88.30 in life insurance benefits.[32] Based upon this evidence, I conclude plaintiff is entitled to recover from Box Butte County $5249.69 in lost benefits under § 2000e–5(g).

### 3. *"Liquidated Damages"*

■ Plaintiff has requested "liquidated damages" for defendants' "wilful violation of the Civil Rights Act of 1964." (Filing 1 at 6–7). It is not clear what plaintiff intended by such a request, as Title VII contains no liquidated damages provision.

■ Although the Civil Rights Act of 1991 amended Title VII in significant respects by, *inter alia,* providing that Title VII plaintiffs could recover compensatory and punitive damages for intentional discrimination,[33] the Eighth Circuit Court of Appeals has held the provisions of this Act are not to be applied retroactively. *Hicks v. Brown Group, Inc.,* 982 F.2d 295 (8th Cir.1992); *Fray v. Omaha World Herald Co.,* 960 F.2d 1370 (8th Cir.1992). Thus, because the alleged violation about which plaintiff complains occurred in 1989 and 1990, I must apply the law as it existed prior to November 21, 1991, the effective date of the 1991 Act.[34]

The remedies available to a plaintiff under the "unamended" Title VII are limited to equitable relief such as reinstatement or hiring, backpay, lost benefits and front pay. *See United States v. Burke,* —— U.S. ——, —— & n. 9, 112 S.Ct. 1867, 1873 & n. 9, 119 L.Ed.2d 34 (1992). Because "liquidated damages" are not available under Title VII, plaintiff is not entitled to this relief.

### B. Compensatory Damages under § 1983

■ Plaintiff requests she be awarded compensatory damages for the violation of her equal protection rights. She is entitled to recover compensatory damages for violations of her constitutional rights under § 1983. *See, e.g., Shaw v. Nebraska Department of Corrections,* 666 F.Supp. 1330, 1339–40 (D.Neb.1987) (plaintiff who prevails on gender discrimination claim may recover back pay for violation of Title VII and compensatory damages for violation of equal protection rights under § 1983). Compensatory damages are designed to compensate plaintiff for, *inter alia,* such injuries as impairment of reputation, personal humiliation, mental anguish and suffering. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974).

In this case the evidence showed plaintiff suffered both emotionally and physically as a result of defendants' discrimination. I therefore conclude plaintiff is entitled to recover compensatory damages against defendants Foley, Schefcik, and Box Butte County, jointly and severally, in the amount of $4,000.00.

### C. Punitive Damages under § 1983

■ Plaintiff requests she be awarded punitive damages for the violation of her equal protection rights. Punitive damages are available against individuals who, acting under color of law, have violated another's constitutional rights with such reckless disregard that punishment for such actions is appropriate. *See, e.g., Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983) (plaintiff entitled to punitive damages if it is proven the defendants were "motivated by evil motive or intent" or acted in a way that suggests "reckless or callous indifference to the federally protected rights of others."); *Wright v. Jones,* 907 F.2d 848

---

**30.** With respect to retirement benefits, the evidence showed that 3% of the employee's gross pay was deducted for deposit into the retirement fund, and the county matched this amount by 1.5%. Therefore, in calculating the amount of lost benefits plaintiff is owed, I have excluded the amount deducted from the employee's gross pay and considered only the matching amount provided by the county. Although plaintiff also asked to be awarded interest on the retirement benefits, she presented no evidence regarding the rate of such interest.

**31.** Evidence with respect to the weed superintendent's health insurance benefits was provided only through August 31, 1992.

**32.** Evidence with respect to the weed superintendent's life insurance benefits was provided only through August 31, 1992.

**33.** *See* section 102 of the Civil Rights Act of 1991.

**34.** I note further that plaintiff neither alleged or argued a cause of action under Title VII as amended by the Civil Rights Act of 1991.

(8th Cir.1990) (applying holding of *Smith v. Wade* ). Punitive damages are not available against municipalities or counties. *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981).

In this case it is clear from the evidence that defendants Foley and Schefcik were the moving forces behind the actions of the weed board and county in hiring the male applicant instead of plaintiff. In fact, an attitude of favoring males permeated their testimony during trial to the extent that they practically, but unwittingly, admitted they had turned a blind eye toward a perfectly qualified applicant and actively sought to sabotage her hiring. Their refusal to accept the possibility that a woman could perform the duties of the superintendent's position has not only caused the county to incur a serious liability, but also has demonstrated the too-long-perpetuated attitude of failing to recognize the worth and contributions of women as human beings. The state of mind held by these defendants, demonstrated by the evidence adduced at trial, shows the reckless disregard contemplated under § 1983 and warrants an award of punitive damages.

When considering the amount of damages to be awarded, I consider the recovery otherwise awarded plaintiff, the degree of wilfulness demonstrated by these defendants, the need to use such an award as a means to ensure the offending practices cease, and the ability of these defendants to pay such an award. *See Hollins v. Powell*, 773 F.2d 191, 198 (8th Cir.1985) (in awarding punitive damages, it is appropriate to consider the defendant's net worth, the character of the defendant's conduct and the need for deterrence over and above the award of compensatory damages). No evidence was adduced at trial concerning the financial status of these defendants, so I have no information on this criterion. Considering the others, however, I conclude plaintiff should be awarded $2,000.00 in punitive damages as against defendant Foley, and $1,000.00 as against defendant Schefcik.

### D. Costs and Attorneys' Fees

Plaintiff has requested she be awarded costs and attorneys' fees in this matter. I conclude she is entitled to such relief under 42 U.S.C. § 2000e–5(k) and 42 U.S.C. § 1988. Therefore, plaintiff will be given 15 days in which to file her application for fees and expenses specifically documenting the amount of such costs and fees in accordance with the guidelines of the Local Rules. Defendants will be given 15 days to respond, at which time the matter will be submitted and the court will consider the amount of fees and expenses to be awarded.

IT THEREFORE HEREBY IS ORDERED:

1. Defendants' motion to dismiss (filing 22) is denied as untimely.

2. Defendants motion for directed verdict is denied, and judgment will be entered for plaintiff in accordance with the terms of this memorandum.

3. Plaintiff is given 15 days to file her application for fees and expenses. Such application shall be in accordance with the guidelines set forth in the Local Rules. Defendants are given 15 days thereafter to respond, at which time the matter will be submitted for consideration.

### MEMORANDUM AND ORDER ON ATTORNEYS FEES

Plaintiff's counsel have filed an application for attorneys fees, claiming $38,519.44 in fees and expenses in connection with this case. There has been no brief received in support of the application, and none received in opposition to it. I have reviewed the affidavits of counsel and the time records and expense statements filed therewith, and I conclude that the requested fees and expenses are to a large extent reasonable.

First, regarding the hourly rate claimed by counsel, I find that the rate of $100.00 per hour is reasonable for these attorneys in federal litigation in western Nebraska. The services rendered in the presence of the court, and the documents provided to the court regarding other services, indicate that all were professionally performed without any apparent lapses in attention or quality. Both attorneys had previous experience in this court and handled their

responsibilities to the plaintiff with proficiency.

■ There is some doubt, however as to the necessity of all of the hours claimed, particularly those claimed by both attorneys for matters that could be termed duplicitous. In reviewing these claims, I have not been assisted by explanations of the necessity of both attorneys being involved at all stages, although that has been done with regard to some actions. In reviewing the claims, I have concluded that the claim for services rendered in connection with the plaintiff's administrative proceedings, which are allowable under Title VII, *Jones v. American State Bank,* 857 F.2d 494, 496–498 (8th Cir. 1988), should be limited to those performed by one attorney. I therefore shall reduce that portion of the claim by not allowing the fees claimed by attorney Moore for the administrative action, 14.3 hours, or $1,430.

■ The remaining hours claimed by counsel appear to be generally reasonable, but are not as fully explained as should have been set forth. I do not fault plaintiff's counsel for sharing responsibilities for the preparation of this matter for trial, as there were numerous witnesses in different locations. That necessity should have been more thoroughly explained, however, in order to charge the defendants with that expense. Similarly there are some items of service for which claims are made that are not adequately described to allow me to determine that they were necessary and reasonable in providing legal representation to the plaintiff. Rather than engage in a line-by-line analysis of each entry on the time sheets, I shall reduce the remaining claim by fifteen percent to account for these shortcomings. This reduction is 46.575 hours or $4,657.50.

■ The items claimed for paralegal services, and the rate for those services, $35.00 per hour, are both reasonable, and have not been challenged.

The items of expenses claimed as reimbursable disbursements also appear to be reasonable, and have not been challenged.

In summary, the calculation of the attorneys fees award is as follows:

Attorney Moore: 184.5 hours claimed
Less: 14.3 hours for administrative proceedings
Less: 25.53 hours (15% of 170.2)
144.67 hours @ $100.00 = $14,467

Attorney Zeilinger: 140.3 hours claimed
Less: 21.045 hours (15% of 140.3)
119.255 hours @ $100.00 = $11,925.50

Total Attorneys Fees: $26,392.50

No party has argued that this amount should be enhanced or reduced in accordance with the factors set forth in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974). The fees for paralegal expenses claimed and for disbursements claimed will also be awarded.

IT THEREFORE HEREBY IS ORDERED, Plaintiff is awarded the following fees and expenses, as against the defendants jointly and severally:

Attorney Fees: $26,392.50
Paralegal Fees: 1,239.00
Expenses: 4,800.44

Total: $32,431.94