**Paul PORTEE, Donna Portee and Justin Portee, An Infant, By Paul Portee and Donna Portee, His Parents and Natural Guardians, Plaintiffs,**

v.

**Henry M. HASTAVA, Benjamin Vajda, and Hastava Real Estate, Defendants.**

**No. CV 90–1769.**

United States District Court, E.D. New York.

May 11, 1994.

Order Granting Reconsideration and Reaffirming June 14, 1994.

Frederick K. Brewington, Law Offices of Frederick K. Brewington, New York City, for plaintiffs.

Larry J. Silverman, New York City, Atty. for defendant Henry Hastava and Hastava Real Estate.

Marianne F. Murray, Rosner & Goodman, New York City, for defendant Benjamin Vajda.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, District Judge.

Paul, Donna, and Justin Portee sued Hastava Real Estate, Henry M. Hastava and Benjamin Vajda[1] for violation of 42 U.S.C. §§ 1981 and 1982; Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq.* (the Fair Housing Act or FHA) (West 1977 & Supp.1994); and N.Y. Exec. Law § 296(5)(a)(1) (McKinney 1993). The case was tried to a jury from September 27 through September 30, 1993. At the close of plaintiffs' evidence, the defendants moved for

judgment as a matter of law, challenging the plaintiffs' *prima facie* case. The motion was in all respects denied. T.256.[2] At the close of all the evidence, the defendants renewed their motion, which was again denied. T.460.

Following the jury's verdict in the Portees' favor, the defendants again renewed their motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b), and moved in the alternative for a new trial pursuant to Fed.R.Civ.P. 59 on the grounds that the verdict was against the weight of the evidence, that the conduct of plaintiffs' counsel rendered the trial unfair, that there was newly discovered evidence, and that the damages were excessive.[3]

For the reasons stated below, the court denies the defendants' motion for judgment as a matter of law, and denies the alternative motion for a new trial on the grounds that the verdict was against the weight of the evidence, that there is newly discovered evidence, and that counsel's conduct rendered the trial unfair. The court vacates the jury's award to the Portees of $280,000, and grants a new trial with respect to compensatory damages only.

### I. Legal Standard for Judgment as a Matter of Law

Fed.R.Civ.P. 50(a)[4] states:

(a) Judgment as a Matter of Law.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the control-

---

1. Although the caption includes three defendants, Henry Hastava does business as Hastava Real Estate, and the court instructed the jury that it should consider the case as if there were only two defendants. T.568.

2. "T. ___" refers to pages in the trial transcript.

3. The motion was made jointly by Hastava and Hastava Real Estate, and joined by Vajda to the extent the motion was relevant to him.

4. Fed.R.Civ.P. 50 was amended effective Dec. 1, 1993. The amendment was technical, correcting an ambiguity in the text of the 1991 revision. *See* FED.R.CIV.P. 50(a)(1), Advisory Committee Notes. Since it would be "just and practicable" to apply the newest version of the rule in this case, that is the version that will apply. The analysis under the 1991 version would be the same.

ling law be maintained or defeated without a favorable finding on that issue.

The Second Circuit has interpreted this rule to require "'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result o[f] sheer surmise and conjecture,' or that the evidence be 'so overwhelming that reasonable and fair minded persons could only have reached the opposite result.'" *Lambert v. Genesee Hospital*, 10 F.3d 46, 56 (2d Cir. 1993) (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir.1992), which quotes in turn *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988), *cert. denied*, 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989)), *cert. denied*, —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994).

■ In deciding a Rule 50 motion, the court must construe the evidence most favorably to the non-moving party without weighing the evidence or passing on the credibility of witnesses. *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993); *Flynn v. Goldman, Sachs & Co.*, 836 F.Supp. 152, 154 (S.D.N.Y.1993). Furthermore, there must be some affirmative evidence to support plaintiffs' version of the facts. "[T]he party bearing the burden of proof cannot create an issue for the jury's resolution by relying solely on the hope that the jury will not trust the credibility of the witnesses." *Flynn*, 836 F.Supp. at 154. "'If all of the witnesses deny that an event essential to plaintiff's case occurred, he cannot get to the jury simply because the jury might disbelieve some of those denials. There must be some affirmative evidence that the event occurred.'" *Martin v. Citibank, N.A.*, 762 F.2d 212, 217–18 (2d Cir.1985) (quoting 9 CHARLES WRIGHT & ARTHUR MILLER, Federal Practice & Procedure § 2527 at 563 (1971)). Because the Portees have introduced sufficient evidence to establish a *prima facie* case of housing discrimination, and have adduced sufficient evidence to allow the jury to infer that the defendants' reasons for denying them housing were pretexts for discrimination, they have carried this burden, and the court cannot grant the defendants' motion for judgment as a matter of law.

The Portees' theory of the case is that Mr. Vajda (1) allowed Mrs. Portee to sign the lease for possession of and gave her the keys to the premises at issue even though her checks had not cleared; (2) upon meeting Mr. Portee and realizing he was black, refused to allow him to sign the lease, kept the checks and retook possession of the premises by taking the keys away from Mrs. Portee; and (3) kept the premises available for rental after their refusal to rent it to the Portees, all because of the race of Mr. Portee.[5] They contend that the agency itself and Mr. Hastava as its owner are responsible for the acts of their agent Mr. Vajda.

Mr. Vajda claims that he had a nondiscriminatory reason for retaking the premises and not allowing Mr. Portee to sign the lease. His position is that (1) the keys were lent to Mrs. Portee only to allow her to show her family the premises; they were not to take possession until after the checks she had given for rent and fees had cleared, (2) Mr. Portee seemed to think that once he signed the lease he was entitled to immediate possession, and (3) Mr. Vajda did not let him sign the lease because Hastava Realty as managing agent could give possession with only the tenants' signatures on the lease, and so needed to wait until the checks cleared on Monday (these events having occurred on Saturday).

Without weighing the evidence or passing on the credibility of witnesses, we examine the evidence in the light most favorable to the Portees to determine whether race played a role in Mr. Vajda's decision not to rent the premises to them.

## II. The Evidence at Trial

The Portees are an interracial couple: Mrs. Portee is white, and Mr. Portee is black. At the time of the events at issue, they had one child, Justin, then 5 years old. T.79, 101. They had become dissatisfied with their living arrangements, and in late 1989 began to look for a new home. T.81–82.

---

5. Hastava Real Estate and Mr. Hastava were found liable on a theory of *respondeat superior;* they were held responsible for the actions of Mr. Vajda, who was primarily liable.

On Thursday, November 30, 1989, Mrs. Portee read an advertisement placed in *Newsday* by Hastava Real Estate (HRE). The ad announced that a house at 105 Newport Road in Island Park (the Premises) was available for rental. She called HRE, spoke with Mr. Vajda, and made an appointment for Saturday to see the Premises and two other units. T.82–83, 85, 260.

On Saturday morning, Mrs. Portee arrived at HRE and met Mr. Vajda. They went to view the Premises, making small talk along the way. Mr. Vajda asked general questions about Mrs. Portee's background, about where Justin went to school, and so forth. He also asked the origin of the name "Portee", commenting that it sounded French, and that his name was commonly pronounced "Vajda" rather than "Voida", the proper pronunciation. Mrs. Portee replied that her name was of French and Indian derivation. T.85–86, 261–62.

## A. Mrs. Portee inspects the Premises and signs the lease

They arrived at the Premises, and Mr. Vajda showed Mrs. Portee around. He explained that the furniture could stay or go, but that if she did not want it she was responsible for disposing of it. He showed her how to adjust the heat in each room. He showed her the fuse box, the kitchen, the washing machine, and so forth. T.86–87, 262–63.

After going through the house, Mr. Vajda showed her the backyard, which included a vegetable garden and a tool shed. T.88. He explained that the Portees would be responsible for cutting the lawn, and told Mrs. Portee that he would put a clause in the lease to the effect that the tools were part of the rental and had to stay with the Premises at the expiration of the lease. T.87.

Mrs. Portee expressed interest in the Premises, but said that she wanted to see the other two apartments Mr. Vajda had mentioned. She testified that Mr. Vajda told her that another couple was coming back later that day to put down a deposit on the Premises, so if she wanted the lease she had to act quickly. Whoever gave him money first would get the lease. With that, Mrs. Portee

told Mr. Vajda that she would give him a binder, and he suggested that they return to the HRE office. T.88–89.

Mr. Vajda's testimony differed from Mrs. Portee's. He testified that he told her that small houses do not stay on the market long, and that she should act quickly. He denied telling her that he had someone "in the bullpen". T.263. Furthermore, he testified that he offered to show her another apartment, but she told him she did not want to see it; she liked the Premises and she was late to pick up Justin. T.264.

They drove back to HRE to take care of the paperwork. Mrs. Portee wrote out two checks: one, for $750, was made out to the landlord for December's rent; the other, for $1,500, was made out to Henry Hastava for the agency's fee ($750) and for a security deposit ($750). T.89. Mrs. Portee told Mr. Vajda that she only had $503.43 in her checking account, not enough to cover the checks. However, she had $1,518.13 in her savings account that she would transfer to her checking account on Monday. In addition, she had about $500 saved at home that she would deposit into her checking account to cover the rest. T.95–96. Mr. Vajda testified that he suggested that if she brought him cash she could have immediate possession, T.266, but she replied that she did not do business that way and she would give him checks. T.266–67. Mrs. Portee denied that this happened. T.135.

Mr. Vajda testified that he explained that she could not take possession of the house until the checks cleared. Since she could not put money into her checking account until Monday morning, he agreed to hold the checks until Monday afternoon. T.94, 96, 265. Mr. Vajda then had a typist add several standard clauses to the lease while Mrs. Portee waited, and when he returned about five minutes later she signed the lease. T.89–90. She signed on the second line, expecting that her husband would sign on the first line. T.93.

At that time, Mr. Vajda also gave her the key to the house. T.90. Mrs. Portee testified that he gave it to her so that she could begin to move her family in that afternoon.

*Id.* Mr. Vajda testified that he gave her the key so that she could show the house to her husband before he signed the lease, since she could not take immediate possession pending clearance of her checks. T.270–71. When Mrs. Portee got the key from Mr. Vajda, she put it on her key ring. T.90, 98.

Mrs. Portee testified that Mr. Vajda saw her getting excited about the house. She said to him, "I will start moving my stuff in today." Mr. Vajda replied by telling her that there was a Foodtown down the block that could probably supply her with boxes for the move. T.90. In addition, Mr. Vajda told her what needed to be done on Monday: she had to have the electricity, telephone, and water put in her name. T.90. However, according to her testimony, Mr. Vajda never told her about any limitations on possession. T.94, 136. Mr. Vajda, of course, did not testify to any of this.

According to Mrs. Portee, Mr. Vajda told her that all he needed was for Mr. Portee to come to the office to sign the lease. T.98. Mr. Vajda asked if she could bring Mr. Portee back earlier than 4:30, when he was done working for the day, and Mrs. Portee said that she would try to find him, since it was his lunch hour. *Id.*

**B. The Portees view the Premises**

She found her husband having lunch at his brother's business, and told him that he had to come with her to sign the lease. They went to pick up Justin at his tap-dancing class, and went to look at the house. T.99.

Mrs. Portee let the family in with the key Mr. Vajda had given her. Mr. Portee worked as a maintenance man at a condominium complex, and was familiar with the workings of a house. T.150. He looked at the fusebox and saw the rooms. He also looked at the sink and turned the water on. T.100, 153, 168. In addition, he used the bathroom and flushed the toilet. T.153.

Mrs. Portee also showed them around outside, explaining that they had to maintain the grounds. She showed Mr. Portee where the tools were in the shed. After this, they went back into the house, and Mr. Portee commented on several things that needed fixing.

He turned the heat up so that the house would be warm when they arrived that evening. T.100–01, 153.

The Portees were happy with the house. As they went through it, they were laughing and joking. They showed Justin the bedroom that was to be his, and showed him the backyard in which he would play. T.101, 154.

**C. Mr. Portee tries to sign the lease**

When they left the house, they locked it and returned to the HRE offices. Mrs. Portee walked in first, and announced to Mr. Vajda that she had returned with her husband. T.102. Mr. Portee testified that he walked in with his hand extended, but Mr. Vajda never took it. T.155. Mr. Vajda contradicted that, saying that Mr. Portee never had his hand out to be shaken. T.284.

When Mr. Vajda saw Mr. Portee, he became very nervous, as if he "didn't know what to do." T.102–03. Mr. Portee said, "Hi, my name is Paul Portee." Mr. Vajda did not respond. He walked away and went upstairs for about 10 or 15 minutes. T.103.

When he returned, Mrs. Portee testified, she saw Mr. Hastava standing behind him in the doorway, T.104, although it is unclear how long he was there. Mr. Vajda approached them, got his coat and hat, and suggested they go to view the Premises. Mr. Portee told him that he had already seen the Premises and just wanted to sign the lease. *Id.*

Mr. Vajda walked back towards them, and Mr. Portee said, "Where's the lease? I want to sign it." Mr. Vajda replied, "I don't have the lease." Mr. Portee responded, "I don't know what's going on here, but I think I know and what you are doing is illegal." T.106.

Mrs. Portee had been standing near her husband with her key ring in her hand. Mr. Vajda walked over to her, grabbed the ring out of her hand, removed the key for the Premises, and gave her the key ring back, not saying a word the entire time. T.106–08. Mr. Portee testified that Mr. Vajda never spoke a word to him or to his wife in his presence. T.176.

Mr. Vajda's version of these events differs from the Portees'. First of all, he testified that he never said or implied that Mr. Portee should come down and sign the lease, since he knew that the lease could not be signed until the money cleared. T.268. Second, he said that he explained to Mrs. Portee that he wanted Mr. Portee to come to see the Premises because he had had several experiences in which he showed a woman a property she liked, so he took it off the market, but when her husband came to see it, he did not like it and so the rental or sale fell through. T.263–64.

Because of this, he was surprised when Mr. Portee walked into HRE with his family and said, " 'I want to sign the lease and get out of here.' " T.275. He excused himself and went upstairs to see Mr. Hastava. Mr. Hastava was on the phone, and did not get off for about 10 minutes. T.276–77. Once he did, Mr. Vajda explained that the Portees were downstairs but that they had written personal checks for the lease. In addition, there were several other matters that needed to be attended to before they could move in. T.275–77. Despite this, Mr. Portee was demanding to sign the lease. T.275, 277.

Mr. Hastava told Mr. Vajda to go ahead with the transaction, but under no circumstances could he let Mr. Portee sign the lease. T.276, 359. This was because HRE was acting as managing agent for the Premises, so that if both tenants signed the lease, they could have taken immediate possession. T.362–63, 401. Mr. Vajda never mentioned that Mr. Portee was black, or that his color was a problem. T.277.

Mr. Vajda returned downstairs while Mr. Hastava remained in his office. T.277. He tried to explain to Mr. Portee that the checks had to clear before he could move in, but Mr. Portee kept interrupting him to say that he had come to sign the lease. T.277–78. Mr. Vajda thought that Mr. Portee thought that signing the lease would give them immediate possession. T.278. He tried to explain that he was not giving the Portees the runaround. *Id.*

During this conversation, Mrs. Portee was standing by her husband with her key ring in her hand. Mr. Vajda testified that he approached her, gently took the key ring from her, and removed the key to the house. While he was doing so, that he was explaining why: it was his only key, she had already used it to show her husband the house, and he needed it to let the water company in to install a water meter. Mrs. Portee did not respond at all while he did this. T.282–84.

### 1. Why Mr. Portee was not allowed to sign the lease

According to Mr. Vajda and Mr. Hastava, there were two reasons, in addition to waiting for the checks to clear, why the Portees could not take immediate possession of the Premises. The first was that an additional clause needed to be put in the lease with respect to the tools in the shed behind the house. The second was that a water meter needed to be installed by the water company before the water could be turned on.

#### a. The tool clause

In addition to the three standard clauses that were inserted in the lease while Mrs. Portee waited, T.89–90, 294–96, the Gartners (the owners of the Premises) required that a clause be inserted in the lease to the effect that the tenants were responsible for the tools, which could be used but not removed from the house. T.290–91, 295. Mr. Vajda had not inserted that clause when he inserted the other clauses (while Mrs. Portee was waiting to sign the lease) because the tool clause was not standard, and he needed to work on the language of the stipulation. T.296–98. Moreover, because he was not expecting the Portees to return until later in the afternoon at the earliest, he did not rush to insert the clause after Mrs. Portee left his office. T.291.

#### b. The water meter

Mr. Vajda also testified that, although he told Mrs. Portee that she had to contact the water company to put the water in her name, he first had to contact them to ask them to install a water meter at the Premises. T.269, 276. The water company had to be contacted twice: once by HRE to have the water meter installed, and then again by the Portees to have the water put in their name. T.308–09. Mr. Vajda claimed that he could

not give the Portees immediate possession because it was his belief that, until the water company was contacted and put in a meter, there was no water in the house. T.269.[6]

### D. The checks

After Mr. Vajda took the keys from Mrs. Portee, Mr. Portee asked, "Where's my checks then?" T.108, 160. According to the Portees, Mr. Vajda told him that he did not have the checks. T.108, 160. Mr. Portee called Mr. Vajda a bigot. T.109, 281. Justin asked his parents what was going on. Mrs. Portee told him that HRE would not rent them the house "because of your father." T.109. Mr. Portee told him it was "[b]ecause I'm black." T.109, 158.

The Portees turned to leave. Mr. Portee told Mr. Vajda, "You are going to be hearing from us." Mr. Vajda either said to them, "You could do what you want," T.109, or, "You can take what you want and do what you want with it." T.157. They walked out.

Mr. Vajda's version is different. He testified that after he took the keys from Mrs. Portee, Mr. Portee asked for the checks back and said that he wanted to call the deal off. T.278–79. Mr. Vajda told him that he was entitled to the checks, and although they were not in his desk, they were in the building. T.279. He did not specifically tell the Portees that Mr. Hastava had them. T.279.

"I told him [Mr. Portee], 'It's on the premises, you could get it back if you wanted,' but I said, 'Why don't we calm down and wait until Monday . . . .' " T.279. According to Mr. Vajda, Mr. Portee replied, " 'I don't believe you've got the checks here. I think you deposited it in the bank already.' " T.279. Mr. Vajda denied this, since he wanted to hold on to the checks until Mrs. Portee could transfer the funds into the account. Furthermore, he testified that the branch of the bank HRE used was closed that day. T.279–80.

Mr. Vajda succeeded, he thought, in calming Mr. Portee down. When the Portees left, it was Mr. Vajda's understanding that the deal was still on, and he would wait until Monday afternoon to deposit the checks. T.280, 285. Acting on that belief, he took the house off the market and did not let any other agent show it. T.285.

### E. The deal falls through

After the Portees left the agency, Mrs. Portee drove Mr. Portee back to his job. In the car, they discussed the events at HRE. Both of them were very upset. T.111–12, 159, 161–62. Mr. Portee said that he thought that HRE had put the checks in the bank. T.161. Justin was also upset and sad. T.112, 216.

After she dropped Mr. Portee off, Mrs. Portee drove home. She was (and is) an office clerk at a law firm. T.113, 239. Once home, she left a message with one of the attorneys in her office, Benjamin Weinstock. She wanted to ask him what to do about the checks in HRE's possession, and also wanted to find out what her rights were in the situation, T.112–13, since the Portees believed that they had been discriminated against because of Mr. Portee's race. T.160. Once Mrs. Portee spoke with Mr. Weinstock, the Portees instituted administrative proceedings in the New York State Division of Human Rights (DHR). T.113–14.

Because of Mr. Portee's belief that HRE had deposited or cashed the checks on Saturday, and on Mr. Weinstock's advice, Mrs. Portee called her bank on Monday, December 4, and asked it to stop payment on the two checks she had given to Mr. Vajda on Saturday. T.116–17.

In addition, when Mrs. Portee went to work on Monday, December 4, she spoke with another lawyer, Brad Rabinowitz, about the incident on Saturday. Mr. Rabinowitz called HRE and spoke with Rosemarie Malone, another agent of Hastava. T.241. He was unsure whether he placed the call spontaneously or whether it was in response to a message from Ms. Malone to call her. T.249. He was also uncertain as to whether he told Ms. Malone that the Portees had stopped

6. In cross-examining Mr. Portee, defendants' counsel represented that the water company had removed the prior water meter in 1988 and did not install another until December 13, 1989, T.168–71. No evidence was offered to support those representations.

payment on the checks for the Premises. T.251.

According to Mr. Vajda, when the Portees left he believed that they still had a deal. T.284–85, 400. As discussed above, he took the house off the market. T.285.

On Monday afternoon, under the impression that Mr. Vajda had cleared up any difficulties with the Portees, T.366–67, Mr. Hastava negotiated the checks to his bank. T.367–68. He knew that the Portees wanted possession as quickly as possible. In his business experience, he had found that a check would clear a day or two more quickly if it were cashed rather than deposited. T.367–68. Therefore, on Monday afternoon, December 4, 1989, he cashed the $1,500 check made out to HRE. T.367.

On Tuesday, December 5, 1989, Mr. Hastava instructed Rosemarie Malone, his other agent, to call the Portees to "continue with the rental". T.370, 416, 420. She did so, and told Mr. Portee she was calling about the Premises. He told her to call Mrs. Portee at work and gave her Mrs. Portee's business number. T.416–17.

Mrs. Portee was not available when Ms. Malone called, so she left a message asking Mrs. Portee to return her call. T.417. Later that day Brad Rabinowitz returned Ms. Malone's call. He told Ms. Malone that the Portees had decided not to go forward with the rental and had stopped payment on their checks. T.417–18. Ms. Malone relayed this information to Mr. Hastava, who put the house back on the market. T.369–71, 421.

**F. Subsequent events**

Within a week after the incident at HRE, a man from Mr. Hastava's office left a message on the Portee's answering machine. T.137–38. According to Mr. Portee, the message said, " 'This is Hastava Realty, can you please give me a call back,' something about a house. 'We have a new house for you,' or something like that." T.173–74. The Portees never returned the call.

On February 27, 1990, after the Portees complained to the DHR, Mr. Hastava sent them a letter apologizing for the "misunderstanding" between them and Mr. Vajda.

T.375. He also told them that another house renting in their price range came on the market. Since houses in that range were rare, he wanted to offer it to them if they were still looking. T.399. In addition, he offered to waive HRE's fee for the rental if they chose to accept it. T.29; Pl.Ex.17. They did not correspond with him at all.

**G. Damages and emotional distress**

About a week after the incident at HRE, however, the Portees' apartment was made uninhabitable by a fire in the apartment above theirs. T.127, 164. The owners put them up, at the owners' expense, at the Holiday Inn in Rockville Centre, where they remained for a month and a half. T.127–28, 164–65.

Each tenant of their apartment building was allowed one room, so the entire family spent that time living in one room together. There were no cooking facilities, so the family ate out every meal. T.128, 166. Under normal circumstances, they spent about $90 per week on food and groceries. T.129. While at the Holiday Inn, they spent about $50 per day on food for the family, or $350 per week. Id. The Portees claimed the difference ($1,500, which is $250 per week for six weeks) as special damages. T.130.

In addition to the added food costs, living at the hotel was a strain for the Portees. Furthermore, during the Portees' stay in the hotel, the owners of their apartment building decided to convert the building into a cooperative, so the Portees could not move back to their apartment. T.142. They moved from the Holiday Inn to an empty unit in the building on a month-to-month basis since they had nowhere else to go. Id. They were forced to take the apartment "as is" while they looked for permanent housing. The apartment was not ready for tenants; it had not been cleaned after the prior tenants moved out, and the heat was not turned on. There was no hot water, and because it was the middle of winter, the temperature often hovered near zero. T.147–48, 166–67.

*1. Donna Portee's emotional distress*

When Mrs. Portee drove Mr. Portee back to work after leaving HRE, she was very

upset. T.111. She also felt hurt for her husband, because she thought that the situation was embarrassing to him. T.112. She was embarrassed, because she told her friends and co-workers what had happened. T.121. She had to explain to Justin why they were not moving into the house. "It's very hard to explain to a five-year-old why you can't live in a certain area." T.122.

In addition to feeling upset, Mrs. Portee suffered at her job. She could not concentrate on simple tasks, and she was very nervous. She made many little mistakes at work. T.122–23. In addition to the upset she felt directly from the discrimination, she suffered the further strain of living in the hotel and then the unheated apartment. T.148.

Her co-workers confirmed that for a period of one or two months following the incident at HRE, Mrs. Portee was not herself. She was not able to perform even simple tasks adequately. T.232, 245. She appeared to recover fully in a working capacity within a month or two from her emotional distress over the alleged discrimination. T.234, 245.

### 2. Paul Portee's emotional distress

Mr. Portee testified that from the moment Mr. Vajda refused to speak with him and refused to let him sign the lease, he felt "[l]ow, like I was a low-life animal." T.157. "My wife signed the lease, she was white. Why couldn't I?" T.158. He was angry that he was not allowed to sign the lease, but rather than yell or scream, he decided to ask a lawyer what he could do. T.159.

Since the incident at HRE, Mr. Portee has felt:

[a] deep hurt, very deep hurt. Lord, it hurt [sic] when it comes to my son and I'm trying to give my son what he wants and somebody tries to take it away from me.... When I try to do for my son and people tell me I can't have it because I'm

black.... It's very hard [to talk to Justin about it], because no matter what way you say it, you are still not saying it right.

T.161–62. In addition, he testified that he has had other emotional and physical problems as a result, he claims, of the discrimination at HRE's hands:

I have to try to calm myself down, so I have a beer and I keep having a beer and I drink.... I used to go to parties with [Mrs. Portee], have a good time, one or two drinks, dance. Now we don't even do that no more [sic].... I don't feel like being with people no more [sic]. It turned me against them.... I still feel bad, low. It's like a space or something when I think about it.

T.162–63.[7]

In addition to these problems, the discrimination allegedly caused Mr. Portee to experience turmoil at work and in his marriage:

I'm very snappy at the guys [at work]. Sometimes I just don't even want to work.... Every time we [Mr. and Mrs. Portee] think about this conversation, I end up yelling at her. Something just don't go right in the house.... I couldn't provide for her like I was supposed to provide for us....

T.163–64. When asked if he had sought treatment for any of the problems he had experienced, he said, "Well, I spoke to a few doctors and I checked out a few AA's, but I haven't made them yet, but I'm planning on it." T.164.

### 3. Justin Portee's emotional distress

Justin, who was nine years old at the time of trial, was five when the events at issue took place. He testified that he was very happy and excited when the family was looking at the Premises, because he "was finally going to get a backyard to play in". T.210. After he witnessed Mr. Vajda take the key

---

7. Mr. Portee also testified that his drinking, which he claims was caused by HRE's discrimination, is "ripping my liver apart and it made my nerves bad". T.163. Although I struck that testimony, the jury heard it. In addition, during Mrs. Portee's testimony, I let her testify that "he [Mr. Portee] was drunk and he wouldn't talk to anybody and he was angry all the time.... He

did eventually apply for Alcoholics Anonymous, but he was going to his doctor, he had a nerve problem.... He's got high blood pressure ... but it didn't help because he was drinking...." T.123–24. Although the jury was given a cautionary instruction at the time, T.124, that caution was not repeated during the general charge on proximate cause. T.582–84.

from his mother's key ring, Justin was "sad" because he "wasn't going to get the basketball hoop and pool and my own room." T.213. On the car ride home, his mother testified, he cried a little, T.112, although Justin did not confirm this during his testimony.

Justin's memory faded after that. He remembered that they moved to a hotel after the fire in their apartment, but he could not remember where they moved after that. T.213–14. He also could not identify the man who took the key from his mother. T.225–26. For a few months after the incident, when Mr. and Mrs. Portee argued, Justin was sad and upset because he did not want them to argue, although he had no idea what they were arguing about. T.215.

### H. Fair housing

Mr. Hastava testified that he did not hold formal classes on the fair housing laws. T.371–72, 397. He did have informal discussions as part of regular office meetings about the import of those laws, and his policy was to rent to anyone who came in the door as long as they could pay. T.395–96, 402–03. In addition, all of his agents were required to take courses in fair housing as part of their licensing. T.396. In the 30 years Mr. Hastava had been in business, only about 50 blacks had ever come in to his agency. Of those, he had sold to none, and rented to two. T.398.

### III. The Jury's Verdict

After about four hours of deliberations, the jury returned with a verdict for the plaintiffs. It found that the Portees had not been allowed to rent the Premises, and that Mr. Portee's race was a motivating factor in that rejection. It awarded general compensatory damages for emotional distress of $100,000 to Mrs. Portee, $100,000 to Mr. Portee, and $80,000 to Justin. It awarded no special damages for increased food costs. It further found that the defendants acted maliciously or wantonly, and it found that Hastava was aware of or notified of Vajda's discriminatory actions. T.605–08. Pursuant to this finding, the jury, after hearing evidence about defendants' ability to pay, returned with a punitive damage award of $31,000 against Mr. Hastava and $1,000 against Mr. Vajda. T.672–73.

### IV. The Motion for Judgment as a Matter of Law

Based on the record, the defendants have not met the high burden required to allow the court to grant judgment for them as a matter of law. Their motion must fail.

Under the FHA,

> it shall be unlawful—(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a). The gravamen of the Portees' complaint is that Mr. Vajda's refusal to allow Mr. Portee to sign the lease for the Premises, coupled with his refusal to return the checks, constituted a statutory refusal in violation of this section. Based on the evidence adduced at trial, the jury was entitled to draw this conclusion.

Both the plaintiffs and the defendants agree on the basic skeleton of the events; only when it comes to the sinews of detail do their versions of what happened diverge. Both sides acknowledge that the Portees read about the Premises in *Newsday*, that Mrs. Portee came to HRE, was shown the Premises, gave Mr. Vajda the checks, signed the lease, and was asked to return at some point with her husband. Mr. Vajda gave her the key to the Premises. When she returned with Mr. Portee, Mr. Vajda left for about 10–20 minutes. When he returned, Mr. Portee was not allowed to sign the lease. The Portees eventually left. On Monday, they stopped payment on the checks, and on Tuesday Mr. Rabinowitz called HRE on their behalf to tell HRE that the agreement was off.

In the details, however, there is disagreement. Mr. Portee claimed that Mr. Vajda refused to shake his hand; Mr. Vajda denies that Mr. Portee's hand was ever extended to be shaken. Mr. Portee said in response to several questions that Mr. Vajda never said a word to him or his wife in his presence; Mr.

Vajda claimed that he spoke to both of them at length, especially when he was trying to calm down Mr. Portee. Mr. Vajda asserted that he gave Mrs. Portee the key to the Premises with the understanding that it was to be used only to show the Premises to her husband. He also averred that he explained what he was doing when he removed it from her key ring. Mrs. Portee said that he gave her the key in order to let her move in, and that he never spoke to her when he "snatched" the key from her ring.

Most importantly, defendants maintain that they did not cash or deposit the Portees' checks on Saturday (nor could they, since the local branch of their bank was closed), but waited until Monday afternoon as they had said they would. There was no evidence to the contrary. Mr. Portee *suspected* that the reason he was not given back his checks on Saturday was that they had been deposited. Mr. Hastava testified that a check that was deposited on Saturday would be stamped by the bank with Monday's date. T.404–05.

This case turned on the jury's determination of the credibility of the witnesses for each side, which was its province alone. T.572–73 (Charge of the Court) ("You, as jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves."); *cf. Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946) ("where ... there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion."). That the jury believed plaintiffs' version of the facts is not a basis for awarding judgment for the defendants as a matter of law. *See Kurn,* 327 U.S. at 653, 66 S.Ct. at 744 ("when th[e] evidentiary basis [for the jury's verdict] becomes apparent, it [is] immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.").

■ Viewing the evidence in the light most favorable to the plaintiffs, and drawing all reasonable inferences in their favor, there was a clear evidentiary basis for the jury's verdict. Mrs. Portee, a white woman, was allowed to give personal checks to cover the rent, fee, and security. She signed the lease. If the jury believed her rather than Mr.

Vajda, she was told that she would get possession of the Premises the same day.

When she returned with Mr. Portee, a black man, and their son, Justin, they were told that they could not take possession that day. Mr. Portee was not allowed to sign the lease, and Mr. Vajda told them that he did not have their checks to return to them.

At that moment, it was reasonable for the Portees to believe that they were being discriminated against because Mr. Portee was black, whether or not discrimination actually occurred. They had made a bona fide offer to rent the Premises, and Mr. Vajda refused to let Mr. Portee sign the lease that would have memorialized the deal.

■ If the jury believed the Portees' version of the events, it reasonably could have drawn the inference that the checks had been deposited, even without evidence of such action. Since the jury apparently did not believe the defendants and gave no credence to their explanation of the absence of the checks, it was entitled to draw any reasonable inference, including that the checks had been cashed or deposited. *See Kurn,* 327 U.S. at 653, 66 S.Ct. at 744 ("Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference.").

■ The defendants' argument that their actions on Monday and Tuesday evince an effort to go ahead with the rental does not save them. Given the jury's determination that the Portees were discriminated against on Saturday, the defendants' actions the next week only show that they attempted to cure the discrimination that had already occurred. Such an effort impacts on proximate cause and damages, not liability. The discrimination was established when Mr. Vajda refused to let Mr. Portee sign the lease and refused to return his checks.

■ Similarly, the jury was free to infer that Mr. Vajda acted maliciously or wantonly, thus allowing an award of punitive damages

against him. *See* 42 U.S.C. § 3613(c)(1). According to Mrs. Portee's testimony, Mr. Vajda's demeanor changed dramatically when he met Mr. Portee. His conduct—refusing to shake Mr. Portee's hand, snatching the keys from Mrs. Portee, refusing to let Mr. Portee sign the lease, refusing to return the checks to the Portees—could be seen to have been willful and wanton. Whether it was or not is not germane; the evidence before the jury allowed it to infer that Mr. Vajda acted maliciously because of Mr. Portee's race.

■ Also based on the Portees' version of the story, the jury could have inferred that Mr. Hastava knew that Mr. Portee was black and that he had been denied the opportunity to sign the lease. Mrs. Portee said that she saw Mr. Hastava standing in the doorway leading to his office while Mr. Portee was trying to sign the lease. And Mr. Vajda, immediately after seeing Mr. Portee, went upstairs and remained there for up to 20 minutes. Based on Mr. Vajda's actions and its conclusion as to his motivation, the jury could reasonably infer that Mr. Hastava was on notice as to Mr. Vajda's conduct. A finding of vicarious liability is not unwarranted.

Since it was reasonable for the jury to have found for the plaintiffs on the question of liability, the court cannot grant judgment as a matter of law to the defendants, and that portion of their motion is denied.

### V. The Motion for a New Trial

■ The defendants have similarly failed to carry the burden of showing that the verdict is "so strongly against the weight of the evidence that [it] may be characterized as a 'seriously erroneous result.'" *Flynn*, 836 F.Supp. at 164 (quoting *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir.1992)). The Second Circuit recently reaffirmed the "seriously erroneous" standard as the proper one in considering a motion for a new trial. *Piesco v. Koch*, 12 F.3d 332, 345 (2d Cir.1993).

"'... Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more rea-

sonable.'" *Sentilles v. Inter–Caribbean Shipping Corp.*, 361 U.S. 107, 110, 80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959) (quoting *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944)). "Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992) (citing *Tennant*), *cert. denied*, —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

■ As discussed above, the outcome of this case hinged on the jury's credibility determinations. Because such determinations are particularly within the province of the jury, and under the analysis above denying the defendants' motion for judgment as a matter of law, the court is constrained to deny their motion for a new trial as well. The jury's verdict was not "seriously erroneous" so as to require it to be set aside. Rather, the verdict was within the bounds of reason, particularly since it turned so heavily on credibility determinations. Whether the court would reach the same result is immaterial; the verdict was supported by competent evidence and reasonable inferences.

■ The defendants claim that "newly discovered evidence" mandates a new trial. That evidence is a letter from NatWest, HRE's bank, confirming that the NatWest branch at which HRE banked was closed all day Saturday, December 2, 1989. In light of the analysis above, this "new" evidence does no more than corroborate Mr. Vajda's testimony, which the jury rejected. Furthermore, the inference of discriminatory intent arose when Mr. Vajda refused to return the checks to Mr. Portee. It does not matter whether they were negotiated on Saturday or Monday; what matters is the fact that Mr. Vajda did not return them on demand. Rejecting the defendants' explanation allows the jury to infer a discriminatory explanation, especially in light of the other evidence the jury found credible.

The defendants also claim that plaintiffs' counsel's improper summation is an alternative ground for a new trial, or at least support for the other grounds advanced in their

motion. But the defendants made no objection to Mr. Brewington's closing at the time. T.504–26. Furthermore, such an implication (that the checks had been negotiated on Saturday) was fair comment on the evidence. It was up to the defendants to answer in their summation plaintiffs' invitation to the jury to infer that the checks had been cashed on Saturday. It is not open to the Court on a post-trial motion to do that which their counsel did not do at the proper time. The motion must be denied.

## VI. The Motion for a New Trial on Damages

As part of their motion for a new trial, the defendants argue that the damages awarded by the jury are grossly excessive. Because the court agrees that the $280,000 in compensatory damages awarded to the plaintiffs is excessive, the court vacates the awards and grants a new trial on the issue of compensatory damages only. This ruling in no way affects the finding of wantonness or malice, the finding that Mr. Hastava should be held liable for Mr. Vajda's actions, or the amount of the punitive damage awards.

The jury's award of compensatory damages was for general damages of emotional distress only. T.584–87, 606. The jury awarded nothing for the special damages of increased food costs claimed by the plaintiffs. T.606–07. We must therefore look at the evidence introduced on the issue of emotional distress to see whether it can rationally support an award of $100,000 each to Mr. and Mrs. Portee and $80,000 to Justin Portee.

As indicated by the verdict, the jury found that the Portees' civil rights had been violated. The evidence that the Portees incurred significant additional food costs was uncontroverted. The only rational reason for the jury to have rejected their claim for those damages was that the causation element was missing. See T.584–85. We can thus draw the conclusion that the jury found that damages arising from the fire in the Portees'

apartment and their subsequent moves to the hotel and the unheated apartment were not proximately caused by Messrs. Vajda's and Hastava's violation of their civil rights.

This conclusion is bolstered by the evidence that the defendants introduced to attempt to show that there had never been a rejection. Although the discrimination took place on Saturday, the defendants offered evidence to show that they tried to make amends on Monday or Tuesday by offering the house to the Portees. Whether they did this out of guilt or out of a belief that the deal had never been called off is beside the point: had the Portees accepted their renewed offer to let the Premises, none of the damage attributable to the fire would have occurred. In the new trial, therefore, plaintiffs should be limited to proving the damages that this jury found flowed directly from the discrimination, i.e., their emotional distress *proximately caused* by the violation of their civil rights. *See Morgan v. Secretary of Housing and Urban Development,* 985 F.2d 1451 (10th Cir.1993) ($5,000 award for emotional distress for FHA violation vacated absent proof of causation); *Cowan v. Prudential Ins. Co. of Am.,* 852 F.2d 688 (2d Cir.1988) (discussed in footnote 9 below).

Unfortunately, because the jury was presented with a great deal of evidence about the conditions the Portees endured in the hotel and subsequently in the unheated apartment, it is impossible to determine the amount of damages that the jury awarded to compensate them for this aspect of their harm. That evidence was in fact nearly as plentiful and powerful as the evidence about their emotional distress arising directly from the violation of their civil rights. A new trial on this issue is required to parse out the damages for emotional distress due to the constitutional violation.[8]

■ Even if the Court accepted that all of the damages awarded were compensation for the constitutional violation, we would order a new trial on this issue. All three awards, and especially those given to Justin

---

8. This is especially so since plaintiffs' in their opposition memorandum recite the evidence of their stay in the hotel and the unheated apartment as a basis for the award of $100,000 to each of the adult Portees and of $80,000 to

Justin. But the jury's finding of no special damages effectively takes this evidence out of consideration in determining the proper amount of damages *proximately caused* by defendants' discrimination.

and to Mr. Portee, shock the judicial conscience and lead the Court to conclude that a new trial on damages is necessary in the interests of justice.

■ A *prima facie* case for emotional damage can be made out solely by oral testimony that a plaintiff was hurt and distressed by allegedly discriminatory actions. "[T]here appears to be no ready device, other than wholly speculative judgments as to credibility," to determine which claims are meritorious. *Ragin v. New York Times Co.,* 923 F.2d 995, 1005 (2d Cir.), *cert. denied,* —

U.S. ——, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991). The Second Circuit views this as a "reason to assert judicial control over the size of damage awards for emotional injury in individual cases." *Id.*

■ This is a case in which the Court should exercise its discretionary control over the jury's award. The damages awarded bear no rational relationship to the injuries proved at trial. They are also far out of line with awards that have been approved in similar cases, which are discussed in the margin.[9] Although the determination in each case

**9.** This Court looked at cases since 1988 in which some form of discrimination resulted in emotional distress. Given ever-present inflationary pressures, we feel that a comparison with older cases would be less fair. These cases are merely representative, and are set out to give a context for our determination that the $280,000 in compensatory damages for emotional distress is a "monstrous" result. In all of these cases, except where indicated, there was competent evidence to link the discrimination with the damages claimed or awarded.

In *Meyers v. City of Cincinnati,* 14 F.3d 1115 (6th Cir.1994), plaintiff was awarded $25,000 for mental anguish, humiliation, and loss of reputation for his wrongful termination and the attendant publicity. He provided evidence indicating that he lost 10 pounds as a result of his emotional distress, he suffered from insomnia, and he suffered from stomach problems for which he was prescribed medication.

In *Johnson v. Hale,* 13 F.3d 1351 (9th Cir. 1994), the plaintiffs, black men, answered an advertisement for a rental apartment. When they arrived to see the apartment, the co-owner refused to show it to them, explaining that her husband would not allow her to rent to "Negro men." The district court awarded $125 to each plaintiff, since the defendant had been polite and had not discriminated in front of third parties. The Ninth Circuit compared the case with other cases involving discrimination and remanded to the district court with an order that that court was to award at least $3,500 to each plaintiff, that being "the minimum that finds support in recent cases and takes into account inflation" and other factors. *Id.* at 1354.

In *Miner v. City of Glens Falls,* 999 F.2d 655 (2d Cir.1993), a police officer was denied due process and forced to retire. He suffered feelings of inadequacy, humiliation and embarrassment at being forced to apply for public assistance in the presence of people he had encountered as a police officer, and stress at having to sell his new home. He also entertained thoughts of suicide. His testimony was corroborated by that of his wife, who also testified about his relationship with her and with their children as a result of his firing. The court held that the

district court's award of $12,000 in compensatory damages for emotional distress was not excessive.

In *United States v. Balistrieri,* 981 F.2d 916 (7th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993), "testers" were sent to an apartment complex to determine if the owners discriminated. When they found out the results of the tests and learned that the owners had discriminated based on their race, they suffered compensable emotional distress. The court determined that such racial discrimination was egregious enough that the plaintiffs' unsupported testimony of mental anguish would support an award of $2,000 for each tester.

In *Baumgardner v. Secretary, United States Dep't of Housing and Urban Development,* 960 F.2d 572 (6th Cir.1992), a male was denied housing because of his gender. He felt hurt and angry, although his emotional distress was ephemeral. He was awarded $500, which was held not to have been clearly erroneous.

In *Butcher v. City of McAlester,* 956 F.2d 973 (10th Cir.1992), firefighters alleged that the defendant city had engaged in union-busting activities that had subjected them to mental anguish. The jury awarded $15,000 to each plaintiff for mental pain and anguish, and another $15,000 per plaintiff for humiliation. The court of appeals held that the two awards were not supported by the evidence, since humiliation would ordinarily be subsumed into mental pain and anguish, and threw out the separate awards for humiliation. Each firefighter got $15,000 rather than $30,000.

In *Littlefield v. McGuffey,* 954 F.2d 1337 (7th Cir.1992), defendant was found liable for housing discrimination based on the race of plaintiff's boyfriend and their child (plaintiff was white, her boyfriend black). Defendant had agreed to rent to her, and had taken a check as security and given her a key. She and her family spent significant time painting and cleaning the apartment. When the landlord discovered her boyfriend was black, he refused to rent to her. He told the boyfriend that "the old man" (himself) had rented the apartment to someone else. He told her that "the boss" (also himself) had rented the apartment to someone else. He told her he

changed the locks and put her belongings out on the porch. He called her at home and, "mimicking a stereotypical black manner of speaking, told her he wanted to move in with her and 'six black guys, ... quit work and take welfare ... and drugs with [her] ... and swap wives with Bruce [her boyfriend].'" *Id.* at 1341. He called her sister, told her he was a member of the Ku Klux Klan, and asked her how her sister (plaintiff) "'could have [gone] to bed with a nigger' and how she could ... have a nigger baby." *Id.* He attempted to lure plaintiff's sister outside on one occasion. He tracked down plaintiff's home address and left a note threatening the life of her boyfriend: "By THE Time you read this message Kiss your Niger [sic] friend goodbye Bitch—he's dead!!!" *Id.* at 1348. Ms. Littlefield testified that she suffered tremendous embarrassment and fear; that she cried after he called her at work, and left work without telling anyone because she was afraid and embarrassed; she would run from her car to her apartment every night clutching her daughter by the arm, with her keys in one hand and a can of mace in the other; she suffered from stomach upset and diarrhea after his phone calls, and she suffered numerous episodes of severe emotional distress, disquiet and fright. The Seventh Circuit held that an award of $50,000 in compensatory damages was supported by the evidence of defendant's egregious and outrageous behavior.

In *Secretary, Housing and Urban Development ex rel. Herron v. Blackwell*, 908 F.2d 864 (11th Cir.1990), prospective buyers of a home entered into a contract with the seller. After the seller found out that the buyers were black, he refused to go ahead with the sale, and rented the property to a white couple. The Eleventh Circuit upheld an award of $40,000 for embarrassment, humiliation, and emotional distress as supported by sufficient evidence. Plaintiffs had testified that they were extremely upset, and their mental state was further undermined by the invasion of privacy caused by the publicity attendant to their case. They also testified about physical symptoms brought on by the emotional distress, including headaches and loss of sleep.

In *Rodriguez v. Comas*, 888 F.2d 899 (1st Cir. 1989), an award of $75,000 for emotional distress to a victim of false arrest was upheld. The plaintiff had sought psychiatric help, and his treating psychiatrist testified that he suffered from post-traumatic stress disorder (PTSD) as a result of the false arrest. His symptoms included chest pains, headaches, insomnia, and recurrent invasive memories of the event. The PTSD lasted for over 20 months and caused plaintiff to miss 108 days of work.

In *Cowan v. Prudential Ins. Co. of Am.*, 852 F.2d 688 (2d Cir.1988), Prudential was found liable for racial discrimination in employment. Judge Winter, sitting by designation, awarded Cowan $15,000 for "severe emotional distress, humiliation, and loss of self-esteem. As a result [of the discrimination], [Cowan's] home life suffered, he began having serious disagreements with his wife, and he began drinking heavily.

His testimony was corroborated by testimony from his wife and from co-workers." *Id.* at 690–91. Judge Winter took several factors into account, all of which were approved by the Second Circuit. Each factor "was directly relevant to whether and to what extent Prudential caused Cowan's emotional distress", *Id.* at 691, and the Second Circuit held that the trial court properly distinguished the injuries (or the scope of the injuries) caused by the discrimination and those caused by other factors.

In *Wade v. Orange County Sheriff's Office*, 844 F.2d 951 (2d Cir.1988), the appeals court upheld the Title VII plaintiff's award of $50,000 in compensatory damages for emotional distress as not excessive. The court found that the evidence supported such an award: plaintiff suffered repeated humiliation at work, defendants' racially motivated harassment included an unwarranted disciplinary sanction based on the false testimony of one of the defendants, and the defendants further caused the sanction to be published in the county newspaper, thereby subjecting the plaintiff to unjustified public embarrassment.

In *Darby v. Heather Ridge*, 827 F.Supp. 1296 (E.D.Mich.1993), black prospective tenants of a home were awarded $200,000 in compensatory damages. The award consisted of $12,840 for monetary loss and $187,160 for emotional distress. The court held this to be excessive. Plaintiffs' only evidence of emotional distress was their testimony that they were very sad and depressed, that they suffered a loss of self-esteem, and that they did not like to be with other people anymore. The court found a remittitur of $150,000 to be required in the interest of justice, the final award of $50,000 representing $12,840 for monetary loss and $37,160 for emotional distress.

In *Coleman v. Zatechka*, 824 F.Supp. 1360 (D.Neb.1993), a handicapped student who was not assigned a roommate successfully sued under the Americans with Disabilities Act. She was awarded $1,000 for her feelings of isolation, segregation and stigmatization, in the absence of any physical manifestation of her psychic injury.

In *Bruhn v. Foley*, 824 F.Supp. 1345 (D.Neb. 1993), the plaintiff, who was not hired to a position because of her gender, was entitled to $4,000 to compensate her for the emotional and physical damage she suffered as a result of the discrimination.

In *Doe v. District of Columbia*, 796 F.Supp. 559 (D.D.C.1992), an HIV–positive applicant to the fire department was entitled to $25,000 for loss of an employment opportunity and emotional pain and suffering for intentional discrimination based on "ill-conceived fears and prejudices."

In *Paxton v. Bearden*, 783 F.Supp. 1011 (N.D.Miss.1992), an employee who had been fired because of her childbearing decision was entitled to $15,000 compensatory damages for emotional distress. She was embarrassed to tell a prospective employer she had been fired; she suffered anguish over dealing with delinquent

must turn on the facts peculiar to that case, where the damages are necessarily difficult to quantify a comparison to other cases is appropriate. *See, e.g., Johnson v. Hale,* 13 F.3d 1351, 1353 & n. 3 (9th Cir.1994); *Cygnar v. City of Chicago,* 865 F.2d 827 (7th Cir.1989). Circumstances peculiar to each of the Portees are set out in brief below.

None of the discrimination in this case was overt. Although the jury did not believe the defendants' story, it is nevertheless quite possible as a matter of objective history that this case resulted from an unfortunate misunderstanding and miscommunication. The defendants must take the plaintiffs as they find them; nevertheless, the discrimination in this case does not even come close to the level necessary to support a total award of $280,000 for emotional distress.

## A. Justin Portee

The evidence supporting a damage award to Justin Portee is insufficient to support an award of $80,000. Justin's sadness at not getting a basketball hoop, a pool, or his own room is touching, but is inadequate to support an award of more than nominal damages. This is especially true given his understandably hazy memory of what happened— after all, he was only five years old at the time of the incident, which took place almost four years before trial.[10]

 Compensatory damages are meant to make a plaintiff whole, not merely to vindicate rights. The violation of a constitutional right, without some measure of real damage, cannot support an award of more than nominal damages. *See Memphis Community Sch. Dist. v. Stachura,* 477 U.S. 299, 308, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986) ("nominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury"); *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Gunby v. Pennsylvania Elec. Co.,* 840 F.2d 1108 (3d Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989); *Stein v. Board of New York, Bureau of Pupil Transp.,* 792 F.2d 13 (2d Cir.) (applying *Carey* ), *cert. denied,* 479 U.S. 984, 107 S.Ct. 572, 93 L.Ed.2d 576 (1986). In the Court's opinion the award of $80,000 to Justin cannot in any rational way be seen as compensatory. It is based primarily on the jury's valuation of the right violated and the jurors' sympathy for Justin. It must be vacated.

## B. Paul Portee

 Mr. Portee testified to having been deeply hurt by the discrimination. Yet he

---

debts and humiliation after she was called to court because of those debts; and she lost her job solely because she gave birth, though she had suffered several previous miscarriages.

In *United States v. Lepore,* 816 F.Supp. 1011 (M.D.Pa.1991), a prospective tenant denied housing because of family status was entitled to $500 in damages to compensate for emotional distress. She was visibly upset when she testified at trial, and she testified that she suffered emotional distress because she was afraid that she and her newborn child would be thrown out on the street.

In *Bradley v. Carydale Enters.,* 730 F.Supp. 709 (E.D.Va.1989), a black tenant discriminated against by her landlord recovered $9,000 for her emotional distress. *The defendant's conduct humiliated and "deeply wounded" the plaintiff:* among other things, he called her a "nigger". Her emotional distress was evident during her testimony, and she testified that she had trouble sleeping and that her job performance was negatively affected. The court limited her damages, however, because she still lived in the apartment, she had never sought counseling after the incidents, and she lost no time from work.

In *Pinchback v. Armistead Homes Corp.,* 689 F.Supp. 541 (D.Md.1988), *aff'd as to that issue,* 907 F.2d 1447 (4th Cir.), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990), a prospective co-operative apartment tenant who was denied a lease because she was black was awarded $2,500 to compensate her for humiliation and emotional distress.

Finally, in *Laudon v. Loos,* 694 F.Supp. 253 (E.D.Mich.1988), a white prospective tenant won a suit against her prospective landlord, who refused to rent to her after he found out that her stepfather was black and she planned to entertain black friends. For her embarrassment and humiliation, and taking into account the means of the defendant, the court awarded $1,500 in compensatory damages.

10. For example, he testified that for a few months after the incident at HRE he heard his parents arguing, and that made him feel sad. T.215. However, he did not know what they argued about, and without some connection between their arguments and the discrimination, this cannot be attributed to the defendants' conduct.

was not able to provide the jury with any medical records to substantiate his claims of emotional distress, despite having seen at least one doctor. T.36–39, 164. Because of this, and because of the admission of the testimony bearing on his physical and emotional condition without any testimony about the causation of those conditions, a new trial is necessary to determine the amount of damages proximately caused by the violation of his civil rights.

## C. Donna Portee

■■■ The evidence supporting Mrs. Portee's claim for damages is the strongest. Nevertheless, it still cannot support an award of $100,000. *See* note 9, *supra.* Although her testimony about her emotional distress in response to the discrimination was corroborated by several witnesses, she also testified that she only made some "little mistakes" at work. T.122–23. Her witnesses also testified that her job performance was affected only for about "a couple of months". T.232, 234 (testimony of Margaret Phillips); T.245 (testimony of Brad Rabinowitz).[11]

The jury was entitled to believe that Mrs. Portee's distress at work was caused by the fire and the move to the hotel and then the unheated apartment. It was equally entitled to believe that her distress was caused by the discrimination. Even if it chose to believe the latter, however, the evidence she presented as to her continuing emotional upset and her few months of sub-par job performance does not support an award of $100,000.

## VII. Conclusion

For the foregoing reasons, the defendants' motion for judgment as a matter of law is DENIED. Their motion for a new trial, on the grounds that the verdict is against the weight of the evidence, that there is newly discovered evidence, and that the conduct of counsel rendered the trial unfair, is DENIED. Their motion for a new trial on the issue of compensatory damages only is GRANTED, and the jury's award of damages in the amount of $100,000 for Donna Portee, $100,000 for Paul Portee, and $80,000 for Justin Portee is hereby SET ASIDE. This ruling in no way affects the jury's determination of liability or of willfulness, or the amount of punitive damages. The parties are ordered to appear ready for a new trial on damages in Courtroom B, Long Island Courthouse, at 9:00 a.m. on Monday, August 1, 1994, and it is

SO ORDERED.

### Memorandum Of Decision And Order On Reconsideration

Defendants Henry M. Hastava and Hastava Real Estate (HRE), joined by defendant Benjamin Vajda, move this court pursuant to Fed.R.Civ.P. 59(e) to reconsider its decision awarding a new trial with respect to compensatory damages only but denying their motion for judgment as a matter of law and for a new trial on the issue of punitive damages. The motion for reconsideration is granted. On reconsideration, the prior decision of the court is reaffirmed in its entirety.

The facts underlying this case are fully set forth in this court's Memorandum of Decision and Order dated May 11, 1994, familiarity with which is assumed.

### Judgment as a matter of law

The defendants take several statements in the Memorandum out of context to support their argument that the evidence could not support the jury's verdict. Taken in context, it is clear that we were breaking no new legal ground, and we certainly were not holding that "a discrimination case can be based purely on the basis of findings regarding the plaintiffs' mental state." Memorandum in Support of Defendants' Motion for Reconsideration (D.Mem.) at 2.

There was no direct evidence of discrimination in this case. Mr. Vajda did not use any racial epithets. (Indeed, the only name-calling took place when Mr. Portee called Mr. Vajda a bigot.) Under these circumstances, the finder of fact had to rely on testimony about the objective manifestations of the ac-

---

11. Mr. Rabinowitz, a lawyer at the firm for which Mrs. Portee works, testified that he thought that her emotional upset had continued to the day of trial. T.246. While this may be true, it was not noticeable in her work. T.245.

tors' mental states. That is, it had to rely on testimony about what was done in order to make its determination as to whether there was discrimination.

On a motion for judgment as a matter of law, all reasonable inferences must be drawn in favor of the non-moving party. *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993). Without weighing the credibility of the witnesses, and without attempting to discern motivations, we examine the evidence. *Flynn v. Goldman, Sachs & Co.*, 836 F.Supp. 152, 154 (S.D.N.Y.1993).

■ When Mrs. Portee, a white woman, came to the HRE office to inquire about rental premises, she was shown the premises at issue in this case; was allowed to give personal checks to cover the first month's rent, the security deposit, and the broker's fee; was allowed to sign the lease; and was given the keys to the house. When she returned to HRE with her husband, a black man, and their son, Mr. Portee was not allowed to sign the lease, and Mr. Vajda did not return their checks.

■ Based on this evidence, the jury could reasonably infer that the reason Mr. Vajda did not let Mr. Portee sign the lease was that Mr. Portee was black. That the court, had it been sitting as finder of fact, would have reached a different conclusion is immaterial; there was sufficient competent evidence to support the jury's verdict. Given that, the court cannot—and should not—disturb that verdict.

Citing *United States v. Tyler*, 758 F.2d 66 (2d Cir.1985), defendants urge us to consider that the jury's disbelief of Mr. Hastava "did not provide a basis for finding that the check was cashed on Saturday." D.Mem. at 4. *Tyler* does not help the defendants here. In *Tyler*, a criminal defendant was convicted of conspiracy to distribute heroin. The evidence had shown that, upon a request from an undercover agent, the defendant had located a seller. There was no evidence of an agreement between the defendant and the seller. The court held that, "although the jury's disbelief of a defendant's testimony may supplement already existing evidence and help make the evidence in a borderline

case sufficient, in the instant case there was simply no existing evidence to supplement." *Id.* at 70 (footnote omitted).

■ Admittedly, there is no direct evidence here that Mr. Hastava deposited the checks. Indeed, the only direct evidence is his testimony that he did not deposit the checks until Monday. And it is axiomatic that "discredited testimony is not considered a *sufficient* basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984) (emphasis added). However, the jury's disbelief of Mr. Hastava's testimony, *coupled with* the fact that Mr. Vajda refused to return the checks to the Portees, would allow the jury to speculate, within reason, as to the cause of the checks' absence. *See Lavender v. Kurn*, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946).

The jury was thus entitled to draw any reasonable inference. It was entitled to disregard Mr. Hastava's testimony completely. *See Bose Corp.*, 466 U.S. at 512, 104 S.Ct. at 1965. If Mr. Hastava had never testified, the only other evidence bearing on the issue was the fact that Mr. Vajda refused to return the checks to the Portees. Based on this evidence alone, the jury could permissibly have conjectured that the checks had been deposited, or that they were waiting to be deposited. Defendants cannot escape the fact that a rational trier of fact had sufficient evidence from which to infer that a statutory refusal had occurred on Saturday once Mr. Portee was not allowed to sign the lease and Mr. Vajda refused to return the Portees' checks.

■ Defendants further claim that their subsequent actions support their argument that the plaintiffs did not prove pretext. Yet once the jury could find that discrimination had occurred, subsequent events were only relevant to the amount of damages and not to the fact of liability. Defendants would like to use the testimony of what occurred on Monday as proof of their mental state on Saturday. The jury was free to disbelieve and disregard all of defendants' testimony on this issue as well. Without that testimony, once again the only evidence is the fact that, on

Saturday, Mr. Portee was not allowed to sign the lease and Mr. Vajda did not return the checks. For the Portees to have stopped payment on their checks on Monday was only reasonable given that they inferred, as did the jury, that the reason the checks were unavailable on Saturday is that they had been deposited. Even if as a matter of *historical* fact they were not deposited until Monday, the jury could determine as a *legal* fact that the discrimination occurred when Mr. Portee was not allowed to sign the lease. *See* Charge of the Court, T.579–82 (detailing findings required in order for jury to find defendants liable for housing discrimination).

In addition, defendants erroneously contend that plaintiffs' failure to disprove pretext mandates a finding in their favor. As detailed above, plaintiffs presented sufficient evident to sustain their burden of producing a *prima facie* case of discrimination, in both senses of *"prima facie* case". *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254 & n. 7, 101 S.Ct. 1089, 1094 & n. 7, 67 L.Ed.2d 207 (1981). Assuming the jury disbelieved the defendants' story entirely, plaintiffs adduced affirmative evidence supporting each element of a *prima facie* case of discrimination. *See St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, ——, 113 S.Ct. 2742, 2747–48, 2752, 125 L.Ed.2d 407 (1993).

There was sufficient evidence adduced at trial to support the jury's determination that all of the defendants were liable for housing discrimination against the Portees. Its verdict cannot be disturbed, and on reconsideration the court reaffirms its earlier decision denying defendants' motion for judgment as a matter of law.

*Punitive damages*

Defendants also move the court to reconsider its decision not to vacate the jury's award of punitive damages. They argue, as they did in their original motion, that there was insufficient evidence to support the punitive damage award. They further argue that, because the court found the compensatory damage award to be excessive, the punitive damage award should also be vacated. Both arguments lack merit.

Addressing the second argument first, it should go without saying that compensatory and punitive damages bear almost no relationship to one another. Compensatory damages, as the name suggests, serve to make an injured party whole; they put a party in as good a position as he would have been in had the wrong not been done to him. *See, e.g., In re Schuyler, Chadwick & Burnham,* 63 F.2d 241, 243 (2d Cir.1933). Punitive damages, on the other hand, are meant to "punish the defendant and to deter him and others from similar conduct in the future." *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992) (citing *Smith v. Wade,* 461 U.S. 30, 54, 103 S.Ct. 1625, 1639, 75 L.Ed.2d 632 (1983)).

The fact that the court determined that the testimony regarding plaintiffs' emotional distress could not support awards totalling $280,000 in no way impacts on the appropriateness of an award of punitive damages. The compensatory damages in this case should redress the plaintiffs for their emotional distress. The court will not comment on an appropriate amount other than to say that $280,000 is far outside a reasonable range. That determination, however, has nothing to do with the propriety of a punitive damage award.

There was sufficient evidence before the jury for it to conclude that punitive damages were appropriate in this case. As to Mr. Vajda, the jury obviously found that his actions in denying the Portees the opportunity to rent were recklessly or callously indifferent to the Portees' civil rights. *See Smith,* 461 U.S. at 56, 103 S.Ct. at 1640. Furthermore, the jury could reasonably have concluded that punitive damages were warranted against Mr. Hastava for his part. For example, Mrs. Portee testified that Mr. Hastava was standing in a doorway during the unfortunate encounter between Mr. Vajda and the Portees. Although there was no other testimony to support this observation, the jury could have credited her testimony on this issue and discounted all the other testimony. This evidence, coupled with Mr. Vajda's actions at the time, would have allowed the jury to conclude that Mr. Hastava had in fact ratified Mr. Vajda's discriminato-

ry treatment of the Portees and warranted the imposition of punitive damages.

In addition, the jury could reasonably have concluded that Mr. Hastava offered no guidance to his agents in the area of fair housing. Mr. Hastava's testimony at trial that he gave such guidance was effectively impeached by his deposition testimony that he did not. The jury was free to disbelieve his explanation for the discrepancy; it could thus have credited his deposition testimony that he gave no instruction to his agents. In addition, Rosemarie Malone, an agent of Hastava, changed her testimony between one day of trial and the next about fair housing instruction at HRE. Counsel, in order to educate the jury, had the opportunity to ask Mr. Hastava whether he was required to give such instruction; she did not. The jury was within its province to take all of this into account.

██ Plaintiffs' counsel asked Mr. Hastava about the number of blacks who had come in to HRE looking to buy or rent, and how many actually had bought or rented. Mr. Hastava estimated that about 50 had come in; he had sold to none and rented to two. It was up to defendants' counsel to give the jury some context by which to analyze these figures by asking how many whites had come to the agency and what percentage of them had bought or rented. That counsel did not do so allowed the jury to infer that the answer would have been damaging to defendants' case.

██ Taken as a whole, this evidence was adequate to support the jury's determination that Mr. Hastava acted at least recklessly with respect to the rights of the Portees. He had a duty not to act discriminatorily himself; he also had a duty to ensure that his agents did not act discriminatorily. See, e.g., Cabrera v. Jakabovitz, 24 F.3d 372 (2d Cir. 1994). Even if he himself overtly did not act discriminatorily, he may be held liable if his agent did so. See State of New York by Abrams v. Ocean Club, Inc., 602 F.Supp. 489,

494 (E.D.N.Y.1984) (discussion of Title VIII cases finding vicarious liability).

██ It is also possible that the duty not to discriminate is non-delegable. A non-delegable duty "imposes upon the principal not merely an obligation to exercise care in his own activities, but to answer for the wellbeing of those persons to whom the duty runs." General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 395, 102 S.Ct. 3141, 3152, 73 L.Ed.2d 835 (1982); see Cabrera, supra, at 388 n. 16; Walker v. Crigler, 976 F.2d 900, 904 & n. 5 (4th Cir.1992). Under this view of the law, Mr. Hastava would be liable for Mr. Vajda's discriminatory acts even if he had explicitly told Mr. Vajda not to discriminate. See Walker, 976 F.2d at 904; cf. Asbury v. Brougham, 866 F.2d 1276, 1280 n. 4 (10th Cir.1989) (discriminatory conduct on part of agent attributable to principal). While the Second Circuit has not explicitly adopted this rationale in fair housing cases, we believe that it is a persuasive interpretation of the law. We do not necessarily reach it here, however, since Mr. Hastava's own action (or inaction) is sufficient to impose liability for Mr. Vajda's discriminatory acts on him.

██ We further find that the amount of punitive damages is fairly based upon the net worth of the defendants and upon the concerns of deterrence and punishment, and would not constitute a windfall to the plaintiffs.[1] See Vasbinder, 976 F.2d at 121. The jury assessed $31,000 against Mr. Hastava and $1,000 against Mr. Vajda. Since their liability for punitive damages has an adequate basis in the record, we look at the amounts only to determine that they are not so high as to result in the financial ruin of the defendants, that they do not constitute a disproportionately large percentage of the defendants' net worth, and that the awards will not constitute a windfall to the plaintiffs. Id., citing Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 373 (2d Cir.1988) and Aldrich v. Thomson McKinnon Sec., Inc., 756 F.2d 243, 249 (2d Cir.1985).

---

1. This conclusion is buttressed by the fact that defendants' counsel, in her closing argument to the jury on the issue of punitive damages, asked that the jury return an award of $10,000 against each defendant. T.670. That the jury did not do so, but rather made individualized calculations for each defendant, further supports the reasonableness of the awards.

Mr. Vajda testified that he was 77 years old; his wife was 68. His net assets (including only his share of any joint assets) were about $190,500. His annual income, including Social Security and retirement income, was about $20,000. His annual expenses, including rent on his house, food, medical expenses, and so forth, were approximately $17,500. We find that an award against him of $1,000 was well within the bounds of reason, representing about 0.5% of his net assets.

Mr. Hastava testified that he was 56, and his wife 52. His net assets (again including only his share of any jointly owned assets) were approximately $350,000. His annual net income was about $50,000, after accounting for approximately $30,000 in annual expenses. We find that an award of $31,000 against him was likewise supported by the evidence and well within the parameters for punitive awards, as it represented less than 10% of his net assets before accounting for his annual income. He is more than 20 years younger than Mr. Vajda, and he has an earning capacity that Mr. Vajda lacks.

Neither award in this case is " ' "so high as to shock the judicial conscience and constitute a denial of justice." ' " *Vasbinder*, 976 F.2d at 121 (quoting *Hughes v. Patrolmen's Benevolent Ass'n*, 850 F.2d 876 (2d Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), which quotes in turn *Zarcone v. Perry*, 572 F.2d 52, 56 (2d Cir. 1978)). In *Vasbinder*, the court reduced punitive damage awards against two defendants that represented over 50% and about 30% of their respective net assets. The final awards ordered by the court (which granted in the alternative a new trial on the issue of punitive damages) represented about 7.5% and 6.67% of the defendants' respective net worths. Here, awards representing about 8.85% and 0.5% of Mr. Hastava's and Mr. Vajda's respective net worths are within the bounds of reason and will not be disturbed.

*Conclusion*

We GRANT the defendants' motion to reconsider their motions for judgment as a matter of law on liability and on the issue of punitive damages. On reconsideration, the court fully REAFFIRMS its prior determinations, and it is

SO ORDERED.